QWEST COMMUNICATIONS
CORP., Plaintiff,

v.

THE CITY OF BERKELEY,
et al., Defendants.

No. C 01–0663 SI.

United States District Court,
N.D. California.

May 23, 2001.

Peter A. Wald, Stephan E. Klein, Janis L. Workman, Randall T. Kim, Latham & Watkins, San Francisco, CA, for Qwest Communications Corp., Plaintiff.

Bruce A. Soublet, Zach Cowan, Manuela Albuguerque, City of Berkeley, Office of City Attorney, Berkeley, CA, William M. Marticorena, Jeffrey Melching, Rutan & Tucker, Costa Mesa, CA, for City of

Berkeley, City Council of Berkeley, Weldon Rucker and Phil Kamlarz, Defendants.

## ORDER GRANTING PRELIMINARY INJUNCTION

ILLSTON, District Judge.

On April 25, 2001, the Court heard argument on defendants' motion to dismiss and plaintiff's motion for a preliminary injunction. Having carefully considered the arguments of the parties and the papers submitted, including supplemental briefing, the Court hereby DENIES defendants' motion to dismiss, and GRANTS plaintiff's motion for a preliminary injunction, for the reasons set forth below.

## BACKGROUND

Plaintiff Qwest Communications Corporation ("Qwest") is a telephone company defined as a public utility under California Public Utilities Code § 216. Compl. ¶ 4. The California Public Utilities Commission ("PUC") has granted Qwest certificates of public convenience and necessity ("CPCN") to provide interexchange, or long distance, telecommunication services. *Id.* at ¶ 1; *see* Declaration of Anne Richeson in Supp. Prelim. Inj. ("Richeson Decl.") ¶ 9 and Ex. A. Qwest provides broadband Internet-based data, voice and image connectivity to businesses, consumers and other communications service providers. Compl. ¶ 28.

In December 1999, Qwest won a competitive bidding process and entered into a government contract to provide faster and expanded telecommunications capacity to the Lawrence Berkeley National Laboratory ("LBN Laboratory"). Compl. ¶ 30; Richeson Decl. ¶ 8. LBN Laboratory is the technical administrator and central hub of a program operated by the United States Department of Energy ("DOE") known as the Energy Sciences Network ("ESNET"). Richeson Decl. ¶ 7. The ESNET is a high-speed communication network that allows Department of Energy researchers and collaborators throughout the nation access to a community of research facilities, resources and information. *Id.* at ¶¶ 3–5.

In order to upgrade LBN Laboratory's telecommunications capacity, Qwest must install a "local loop" between LBN Laboratory and Qwest's central system. Compl. ¶ 31; Richeson Decl. ¶ 10. This involves constructing a conduit—"a pipeline of sorts"—through which fiber optic cable is strung. *Id.* at ¶ 32. Sometime in March 2000, Qwest began to formulate a construction plan to lay its conduit through public rights-of-way in the City of Berkeley ("City" or "Berkeley"). *Id.* at ¶ 32. Qwest met and communicated with city officials from April through December 2000 to negotiate an acceptable construction plan to encroach upon the City's public rights-of-way. *See id.* at ¶¶ 33, 35, 41–45. The parties were unable to agree, and Qwest consequently did not obtain the necessary permits to begin construction. Qwest claims that the City refused to process its application after July 10, 2000, pursuant to a *de facto* moratorium on telecommunications infrastructure construction pending enactment of an ordinance affecting installation of telecommunication services in Berkeley. *Id.* at ¶¶ 35–40.

On December 22, 2000, Berkeley enacted Ordinance No. 6608–N.S. (codified at Berkeley Municipal Code §§ 16.10 et seq.) (the "Ordinance"), effective January 21, 2001. *Id.* at ¶ 46. On January 23, 2001, the City passed a Fee Schedule to accompany the Ordinance. *Id.* at ¶ 48. The City's new Ordinance creates a comprehensive scheme intended "to more specifically regulate Telecommunications carriers providing telecommunications services using public rights of ways and other public property." Ordinance § 16.10.010 (attached at Complaint, Ex. B).

The Ordinance applies to all telecommunications carriers seeking to encroach upon Berkeley's public rights-of-way to provide telecommunication services. Ordinance § 16.10.030. All carriers must first obtain registration and pay related registration fees, which must be updated annually. *Id.* at § 16.10.040; *see also* Fee Schedule 2–3 (attached at Complaint, Ex. C). All carriers must also obtain a Special Telecommunications Permit pursuant to § 16.10.050 of the Ordinance and pay additional fees. *See also* Fee Schedule 3–4. Unless a carrier claims exemption under § 16.10.070, and the City affirmatively determines that an exemption does indeed apply, all carriers are subject to a franchise fee to provide telecommunications services using the City's public rights-of-way. *See also id.* 5–7.

Qwest filed this lawsuit against the City of Berkeley on February 13, 2001, seeking primarily to invalidate the new Ordinance and Fee Schedule pursuant to the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, and the "conflict with general laws" provision of the California Constitution. Cal. Const. art. XI, § 7. According to Qwest, Berkeley's Ordinance is preempted by the Federal Telecommunications Act of 1996 ("FTA"), 47 U.S.C. §§ 253(a) and (c), the California Public Utilities Code §§ 7901 and 7901.1, and the California Government Code § 50030. Qwest also asserts a claim of intentional interference with contractual relationship.

Presently before the Court are a motion by the City to dismiss the complaint and a motion by Qwest for a preliminary injunction based on the preemption claims. These motions were fully briefed and scheduled for argument on April 25, 2001. On April 24, 2001, the Ninth Circuit decided *City of Auburn et al. v. Qwest Corporation,* 247 F.3d 966 (9th Cir.2001), which addresses and resolves many of the questions presented in the instant motions. The parties addressed the new case during oral argument, and were also given the opportunity to submit, and did submit, supplemental briefs on the impact of the *City of Auburn* case. The Court has considered the supplemental briefing in deciding the questions before it.[1]

## DISCUSSION

### I. Berkeley's Motion to Dismiss

■ The City seeks dismissal of the First (federal preemption) and Fifth (intentional interference with contractual relationship) Causes of Action, and any claims in the complaint which challenge the Fee Schedule, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) requires that a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Even if the face of the plead-

---

1. Defendant requests additional oral argument to follow-up on the parties' supplemental briefing. *See* Deft.'s Ltr. to Court (dated May 10, 2001). The supplemental briefs elaborated on questions that were reached either in prior briefing or at oral argument. The parties' respective positions on these questions are now clearly established, and thus, a second hearing is not needed. Defendant's request for further oral argument is DENIED.

ings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir. 1981).

■ If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir.2000) (citations and internal quotation marks omitted).

## A. Federal Preemption (First Cause of Action)

Qwest's First Cause of Action seeks a declaration that the Ordinance is void under the Supremacy Clause of the United States Constitution, because it is preempted by § 253 of the Federal Telecommunications Act.[2]

In its motion to dismiss, the City argued that the First Cause of Action must be dismissed because § 253 of the FTA does not create an express or implied private right of action under which Qwest could sue. At oral argument, however, the City withdrew this challenge to Qwest's standing in light of the recent decision, *City of Auburn v. Qwest Corp.,* 247 F.3d 966 (9th Cir.2001). The Ninth Circuit in *City of Auburn* allowed Qwest to raise a federal preemption challenge based on § 253 against several local ordinances regulating telecommunications service carriers. The court did not discuss whether Qwest could sue under § 253 but instead cited the Supremacy Clause of the United States Constitution.[3] The court held that § 253 of the FTA expressly preempts any state or local law that is contrary to its provisions, and the only question for the court "is whether the ordinances 'interfere with, or are contrary to' the Act." *Id.* at 980 (citing *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)).

**2.** 47 U.S.C. § 253 provides as follows, in pertinent part:

(a) In general: No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority: Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority: Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral

and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption: If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

**3.** Article VI, Clause 2: This Constitution and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

■ Qwest's challenge to the Ordinance here is also based on the Supremacy Clause. Compl., ¶¶ 2, 67, 73. The Supreme Court has affirmed what *City of Auburn* implicitly held: private plaintiffs seeking injunctive or declaratory relief may challenge a state statute or local ordinance pursuant to the Supremacy Clause, regardless whether a federal statute confers a private right of action on the plaintiffs. *Shaw v. Delta Air lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."); ·see also *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1269 (9th Cir.1994) ("Even in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal pre-emption.").

The First Cause of Action for federal preemption of the Ordinance states a claim upon which relief can be granted; the motion to dismiss this claim is·DENIED.

## B. Intentional Interference with Contractual Relationship (Fifth Cause of Action)

■ The City argues that the intentional interference with contractual relationship claim fails because Qwest has not submitted a compensation claim with the City as required by the California Tort Claims Act, California Government Code § 810 et seq. With respect to Qwest's claim for damages, the City is correct.

■ The Tort Claims Act represents a limited waiver of sovereign immunity to bring tort claims against the State of Cali-

fornia and its public entities, including municipalities such as Berkeley. *See* Cal. Gov.Code § 815 and § 811.2 (defining public entity to include City or City Council). Plaintiffs desiring to bring tort claims against a public entity must comply with the detailed procedural requirements enumerated in the Tort Claims Act, and failure to do so is a bar to suit. *Williams v. Horvath*, 16 Cal.3d 834, 838, 129 Cal.Rptr. 453, 548 P.2d 1125 (1976); *San Jose v. Superior· Court*, 12 Cal.3d 447, 455, 115 Cal.Rptr. 797, 525 P.2d 701 (1974). As the City correctly notes, one procedural prerequisite under the Tort Claims Act is that a claimant seeking monetary damages must file a written claim with the proper public entity before commencing suit. *See* Cal. Gov.Code §§ 905 and 905.2. Such a claim must be presented no later than six months after the cause of action accrued. *Id.* at § 911.2.

Qwest alleges in its Fifth Cause of Action that it "has suffered and continues to suffer damages" as a result of the City's unlawful conduct, and requests "such consequential damages ... as Qwest may prove to the Court." Compl. ¶ 107 and Prayer for Relief, ¶ (ix). Yet, Qwest does not allege that it has submitted a claim with the City to seek compensation for such alleged damages. Thus, Qwest's claim for damages is barred.

■ Qwest points out, however, that its tort claim against the City also seeks injunctive relief, which is not subject to the procedural requirements of the Tort Claims Act. *See Minsky v. City of Los Angeles*, 11 Cal.3d 113, 121, 113 Cal.Rptr. 102, 520 P.2d 726 (1974); *see also Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1130 n. 9, 270 Cal. Rptr. 1, 791 P.2d 587 (1990) ("Injunctive relief is available to restrain unjustified interference with contractual relations when damages would not afford an ade-

quate remedy.") (citations omitted). At oral argument, Qwest withdrew any claim for damages asserted in its cause of action for intentional interference of contractual relationship.

Qwest's claim for monetary damages in the Fifth Cause of Action is barred and the City's motion to dismiss it is GRANTED. As to injunctive relief only, the Fifth Cause of Action states a claim upon which relief can be granted; as to this claim, the motion to dismiss is DENIED.

## C. Challenges to the Fee Schedule

■ As a more general matter, Berkeley argues that all claims in the complaint which challenge the Fee Schedule or portions of the Ordinance implementing the Fee Schedule must be dismissed as barred by the Tax Injunction Act of 1937 ("TIA"), 28 U.S.C. § 1341. Qwest responds that the charges imposed by the Fee Schedule are not taxes within the meaning of the TIA, and thus the Court is not required to abstain.

■ The TIA states: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. It is a question of federal law whether a municipal charge constitutes a tax. *Wright v. Riveland*, 219 F.3d 905, 911 (9th Cir.2000); *see also Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1, (1st Cir.1992) (label placed on assessment by state may be pertinent in deciding whether assessment is "tax," but label is not determinative). The Ninth Circuit relies on three considerations in making this determination: (1) the entity that imposes the charge; (2) the parties on whom the charge is imposed; and (3) whether the funds collected for the charge are expended for general public purposes, or used for the regulation or benefit of the parties on

whom the charge is imposed. *Bidart Bros. v. California Apple Comm'n*, 73 F.3d 925, 931 (9th Cir.1996); *see also San Juan Cellular Tel. Co. v. Public Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir.1992) (describing classic tax as "imposed ... upon many, or all, citizens [and] raises money, contributed to a general fund, and spent for the benefit of the entire community," whereas classic regulatory fee was imposed upon narrow class to serve "regulatory purposes ... [by] raising money placed in a special fund to help defray the agency's regulation-related expenses").

Applied in this case, the first two factors under *Bidart Bros.* offset each other and provide no clear guidance as to whether the Fee Schedule exacts fees or taxes. The City Council of Berkeley (a legislating body) imposes the exactions, but the parties subject to the charges (service providers seeking installation of telecommunications equipment and conduits) are a narrowly defined target class. *See Hexom v. Oregon Dept. of Transp.*, 177 F.3d 1134, 1136 (9th Cir.1999) ("[C]lassic 'tax' is imposed by a legislature upon many, or all, citizens."); *Bidart Bros.*, 73 F.3d at 931 ("An assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class."). In cases like this, where the first two factors are not dispositive, courts examining whether an assessment is a tax "have tended ... to emphasize the revenue's ultimate use." *Bidart Bros.*, 73 F.3d at 932 (citation omitted); *see also Hexom*, 177 F.3d at 1136 ("Courts facing cases that lie near the middle of this spectrum have tended to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's costs of regulation.").

■ The City relies on Qwest's own pleadings to argue that the Fee Schedule exacts taxes, not regulatory fees. It cites allegations made by Qwest that the fees exacted "are classic franchise fees designed to generate general municipal revenues, and do not recover any actually incurred costs." Reply in Supp. Mtn. to Dismiss 9 (citing Compl. ¶¶ 59, 72, 78). These allegations are included to demonstrate why the fees violate § 253(c) of the FTA, which allows municipalities to assess only reasonable and fair charges as compensation for use of public rights-of-way. However, a fee that violates § 253(c) does not necessarily amount to a tax as defined under the TIA. Such a rule would vitiate the preemptive purpose of the FTA because federal courts would have to abstain, pursuant to the TIA, every time there is a challenge that a fee violates § 253(c).[4] Rather than rely on Qwest's allegations, the Court turns instead to the Fee Schedule itself, which gives ample description of the purpose and use for the fees.

The Fee Schedule labels the charges it imposes "fees" and notes that they "are intended to recover all reasonable costs associated with the City's activities needed to regulate the installation, operation, and maintenance of systems and equipment of telecommunication carriers within the City limits." Fee Schedule 3. Two categories of charges are imposed: cost-recovery fees (registration and permit fees) and annual rent compensation rates (franchise fees).

Cost-recovery fees seek to compensate the City "for the implementation and administration of the City's new Telecommunications Ordinance." *Id.* These costs include 1) an Ordinance Surcharge amounting to "upfront costs" for developing and implementing the Ordinance, 2) an Annual Registration Fee to recover ongoing administrative costs "to process and monitor all aspects of the [regulatory] program," and 3) a Permit and Inspection Fee to cover the costs of processing permit applications and conducting site inspections. *Id.* at 1–4. By its own terms, the Fee Schedule asserts that the cost-recovery fees aim to recoup specific costs related to implementing and administering the Ordinance. This urges a finding that the Fee Schedule exacts a regulatory fee, not a tax. *See Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305, 1312 (10th Cir.1999) (surcharge for disabled person placard was a fee because "[n]ot only are the charges expressly linked to a specific regulatory scheme but also the monies collected pursuant to the charge are used to defray the expenses associated with administering the scheme.").

The annual rent compensation rates seek recovery "for use of the public right-of-way owed by telecommunications carriers." *Id.* at 1. These rates essentially are rent for use of city-owned property, *see* Fee Schedule 5 (referring to telecommunication carriers as "franchisees/licensees"), which do not amount to taxes under the TIA. *See City of Dallas v. FCC*, 118 F.3d 393, 397–98 (5th Cir.1997) ("Franchise fees are not a tax, however, but essentially a form of rent: the price paid to rent of public right-of-ways."); *United States v. City of Huntington*, 999 F.2d 71, 74 (4th Cir.1993) ("User fees [which] are payments

---

4. The Court notes an internal inconsistency in the City's argument, which was recognized by the district court in *AT & T Communications of Southwest, Inc. v. City of Austin*, 42 F.Supp.2d 708, 711 n. 4 (S.D.Tex.1998):

On the one hand, the City argues the franchise fees sought under the Ordinance are not tied to a local telephone provider's use of the public rights-of-way, and therefore the fees sought are a tax under the Tax Injunction Act. On the other hand, the City argues that the franchise fee may very well be tied to use of the public rights-of-way, in which case the franchise fees fall under the protective umbrella of § 253(c) of the FTA.

given in return for a government-provided benefit."); *AT & T Communications of Southwest, Inc. v. City of Austin*, 42 F.Supp.2d 708, 711 n. 4 (S.D.Tex.1998) (franchise fee imposed on telecommunication carriers for use of public rights-of-way do not amount to taxes); *Capital Leasing of Ohio, Inc. v. Columbus Mun. Airport Auth.*, 13 F.Supp.2d 640, 649–52 (S.D.Ohio 1998) (fee charged for use of airport space considered rent, not a tax under the TIA).[5]

The Court finds that the fees imposed by the Fee Schedule constitute regulatory fees rather than taxes. The TIA thus does not apply, and the City's argument that all claims challenging the Fee Schedule must be dismissed.

Having rejected all of the City's challenges to Qwest's claims on the pleadings, the Court DENIES the City's motion to dismiss the complaint for failure to state a claim upon which relief can be granted.

## II. Qwest's Motion for Preliminary Injunction

■ The Court now turns to Qwest's motion for a preliminary injunction enjoining the City from enforcing its Ordinance and Fee Schedule and ordering the City to issue the permits necessary to allow Qwest to complete construction in accordance with its contractual obligations.

■ A district court has authority to grant a preliminary injunction in the exercise of its equitable powers. Fed.R.Civ.P. 65. As the court is acting in equity, the decision to enter a preliminary injunction is largely left to its discretion. *See Big Country Foods, Inc. v. Board of Educ. of Anchorage School Dist.*, 868 F.2d 1085,

1087 (9th Cir.1989). Traditionally, this rule has been interpreted to require the trial court to consider the likelihood that plaintiff will prevail on the merits *and* the possible harm to the parties from granting or denying the injunctive relief. *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987); *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir.1984).

■ At the extremes, the party seeking injunctive relief must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, *or* (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215 (9th Cir.1987). "These are not two distinct tests, but rather the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" *Miss World*, 856 F.2d at 1448 (quoting *Rodeo Collection*, 812 F.2d at 1217). However, in any situation, the court must find that there is some threat of an immediate irreparable injury, even if it is not of great magnitude. *Big Country*, 868 F.2d at 1088 (citing cases); *Oakland Tribune, Inc. v. Chronicle Publishing Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir.1985) (citing cases).

### A. Probability of Success on the Merits

The Ninth Circuit very recently published a decision that has great relevance to

---

5. At oral argument, the City cited to *Keleher v. New England Telephone & Telegraph Co.*, 947 F.2d 547, 549 (2d Cir.1991), for the proposition that franchise fees are taxes within the meaning of the TIA. The underlying factual and legal questions involved in *Keleher* are different from those involved here. In any

event, the Second Circuit's holding in *Keleher*, concerning the reach of the jurisdictional bar imposed by the TIA, was rejected by the Supreme Court in *Jefferson County, Alabama v. Acker*, 527 U.S. 423, 433, 119 S.Ct. 2069, 2076, 144 L.Ed.2d 408 (1999).

this action. In *City of Auburn v. Qwest Corporation*, 247 F.3d 966 (9th Cir.2001), the court considered whether the FTA preempted several new ordinances that attempted to regulate telecommunications services providers. The ordinances required providers to submit a "lengthy and detailed application form, including maps, corporate policies, documentation of licenses, certain specified items, and 'such other and further information as may be requested by the City.'" *Id.* at 981. Application fees were charged, ranging from an undetermined amount to $5,000. Two of the ordinances required a public hearing before granting or revoking permission to operate in the city. All of the ordinances regulate transferability of ownership and require providers to report stock sales. The "ultimate cudgel" was that each city reserved discretion to grant, deny, or revoke permission to provide telecommunications services, even allowing removal of a company's facilities. The ordinances also provided for civil and criminal penalties should any of their provisions be violated.

The Ninth Circuit held that each of these requirements individually "ha[s] the effect of prohibiting" the provision of telecommunications services, and taken together, "they create a substantial and unlawful barrier to entry into and participation in the cities' telecommunications markets" in violation of § 253(a). *Id.* at 981. The court then considered whether the ordinances were saved under the safe harbor provision of § 253(c), and concluded that they were not. The court found that the ordinances impermissibly attempted to regulate companies with facilities in the public right-of-way, as opposed to effecting right-of-way management. *Id.* at 983. The ordinances imposed "an extensive application process that is not directly related to management of the public rights-of-way .... includ[ing] data gathered by the cities in order to determine the financial soundness, technical

qualifications, and legal ability to provide telecommunications services; a description of all services provided currently or in the future; and unnamed discretionary factors ...." *Id.* The most problematic aspect was that the ordinances granted local governments unfettered discretion to grant, deny, or revoke permission based on unnamed factors.

Qwest argues that, like the preempted ordinances considered in *City of Auburn*, Berkeley's new Ordinance creates an unlawful barrier to entry, and the accompanying Fee Schedule exacts fees that exceed the fair and reasonable cost of regulating the City's public rights-of-way. For these reasons, Qwest contends that the Ordinance and Fee Schedule violate § 253(a) and (c) of the FTA. The City contends first that the FTA does not even apply because Qwest's contract with LBN Laboratory does not call for common carrier services, and thus does not involve "telecommunications services" within the meaning of § 253; and, more generally, that its Ordinance does not violate § 253.

### 1. Common Carrier Status

 Section 253(a) preempts State and local statutes or regulations that create barriers to entry against any "telecommunications service." The FTA defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." *Id.* at § 153(46). Furthermore, a "telecommunications carrier" is defined as "any provider of telecommunications services .... A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services ...." *Id.* at § 153(44). For pur-

poses of coverage, § 253(a) treats telecommunications services as common carrier services. *See In re AT & T Submarine Systems,* 13 F.C.C.R. 21585, ¶ 6 n. 12, 1998 WL 709391 (1998), *review denied,* 198 F.3d 921 (D.C.Cir.1999) ("[T]he 1996 Act indicates that the definition of telecommunications services is intended to clarify that telecommunications services are common carrier services.") (citing *Cable & Wireless,* 12 F.C.C.R. 8516, 8521–8522, 1997 WL 339269 (F.C.C.1997)); *In re Implementation of the Non–Accounting Safeguards of Section 271 and 272 of the Communications Act 1934, as Amended,* 11 F.C.C.R. 21905, ¶ 263, 1996 WL 734160 (1996) (same).

■■■ The upshot of the various definitions under the FTA is that the statute applies only to telecommunications services offered on a common carrier basis. *See Howard v. America Online, Inc.,* 208 F.3d 741, 751–53 (9th Cir.2000); *Iowa v. FCC,* 218 F.3d 756, 758 (D.C.Cir.2000) ("[A] carrier that provides a service on a non-common carrier basis is not a 'telecommunications carrier' and hence is ineligible [under § 254 of the FTA]."); *Southwestern Bell Telephone Co. v. FCC,* 19 F.3d 1475, 1480 (D.C.Cir.1994); *In re Federal–State Joint Board on Univ. Servs., Report and Order,* 12 F.C.C.R. 8776, 9177, ¶ 785, 1997 WL 236383 (F.C.C.1997) (FCC has determined that "telecommunications services" means "only telecommunications provided on a common carrier basis."). The Supreme Court defined a common carrier as one that "makes a public offering to provide [communications facilities] whereby all members of the public who choose to employ such facilities may communicate or transmit intelligence of their own design and choosing." *FCC v. Midwest Video Corp.,* 440 U.S. 689, 701, 99 S.Ct. 1435, 1442, 59 L.Ed.2d 692 (1979) (adopting analysis of *National Association of Regulatory Utility Comm'rs v. FCC,* 525 F.2d 630, 641 (D.C.Cir.)), *cert. denied,* 425

U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). Furthermore, "[a] common carrier does not 'make individualized decisions, in particular cases, whether and on what terms to deal.'" *Id.; see also In the Matter of Federal–State Joint Board of Universal Service,* 13 F.C.C.R. 11501, ¶ 124, 1998 WL 166178 (F.C.C.1998) ("Common carriers can be distinguished from private network operators, which serve the internal telecommunications needs of, for example, a large corporation, rather than selling telecommunications to the general public.... [A] carrier may be a common carrier if it holds itself out to service indifferently all potential users.").

The California PUC has issued Qwest CPCNs to provide telecommunications services on a common carrier basis. *See* Richeson Decl. ¶ 9 and Ex. A. Nonetheless, the City argues that Qwest's contract with LBN Laboratory resulted from a competitive bidding process, which suggests that "the business relationship between Qwest and LBNL/DOE was intended to 'make individualized decisions, whether and on what terms to serve' and not to undertake to carry to all people indifferently." Oppo. to Prelim. Inj. 16:21–24. It further notes that the LBN Laboratory contract allowed for custom tailored customer premises equipment and the assignment of specific personnel. Deft.'s Suppl. Brief 7–8. Based on its reading of the LBN Laboratory contract, the City argues that Qwest "appears to choose 'its clients on an individual basis and determine in each particular case whether and on what terms to serve.'" Oppo. 17:1–2. Thus, according to the City, notwithstanding the California Public Utility Commission granting CPCNs to Qwest, the ESNET contract in particular involves services provided on a non-common carrier basis. *See National Ass'n of Regulatory Utility Comm'rs v. FCC,* 533 F.2d 601, 608 (D.C.Cir.1976) ("*NARUC II*") ("Since it is clearly possi-

ble for a given entity to carry on many types of activities, it is at least logical to conclude that one can be a common carrier with regard to some activities but not others.").

■■■ The City focuses too narrowly on the type of service Qwest is offering to LBN Laboratory. Common carrier service does not require that the particular services offered be made practically available to the entire public. "[A] specialized carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if he holds himself out to serve indifferently all potential users ...." *NARUC II*, 533 F.2d at 608–09. Consequently, the fact that the LBN Laboratory contract resulted from a competitive bidding process and contemplates tailored services does not mean that Qwest intends to offer non-common carrier services. *See In re Federal–State Joint Board of Universal Service*, F.C.C. 00–449, ¶ 12 n. 33, 2000 WL 1869492 (F.C.C.2000) (common carrier may enter into separate agreements with each of its customers if it does not charge negotiated individual rates and terms); *In re AT & T Communications Revisions to Tariff F.C.C. No. 12*, 6 F.C.C.R. 7039, ¶ 66, 1991 WL 637944 (F.C.C.1991) ("A common carrier may supplement its generic offerings with offerings that are designed to meet the needs of a particular customer or limited number of customers without violating the unreasonable discrimination prohibition if that carrier makes that more customized offering available to anyone who might find it useful and the offering is not otherwise unlawfully discriminatory.") (citing *Sea–Land Service, Inc. v. I.C.C.*, 738 F.2d 1311, 1317 (D.C.Cir.1984)).

■■■ Qwest describes itself as "a global leader in delivering high-quality broadband Internet-based data, voice, and imagery connectivity securely and reliably to businesses, consumers, and other communications service providers." Compl. ¶ 28; *see also* Richeson Decl. ¶ 2. Some of these services, such as that contemplated by the LBN Laboratory contract, are practical and useful only to consumers with a need to rapidly transmit large quantities of information between two fixed points. Declaration of Anne Richeson in Supp. of Reply ("Richeson Reply Decl.") (April 5, 2001) ¶ 2. "It is not an obstacle to common carrier status that [Qwest may] offer a service that may be of practical use to only a fraction of the population, .... the key factor is that the operator offers indiscriminate service to whatever public its service may legally and practically be of use." *National Ass'n of Regulatory Utility Comm'rs v. FCC*, 525 F.2d 630, 642 (D.C.Cir.1976) (*NARUC I*). Qwest avers that it offers high-speed telecommunications services on a nondiscriminatory basis to any other consumer who might find it useful and practical. In fact, Qwest notes that "[t]o the extent it has capacity and means to do so, Qwest will offer any excess capacity in the fiber optic cable indifferently to all other potential users of this type of service, and is willing to make the same rates, terms and conditions contained in the LBNL/DOE Contract available to any other similarly situated users." Richeson Reply Decl. ¶ 4.

The City has brought forth no other evidence to dispute Qwest's showing that its contract with LBN Laboratory involves the offering of high-speed telecommunication services to a particular class of consumers on a nondiscriminatory, common carrier basis. The facts and pleadings on record indicate that Qwest has standing to raise a preemption challenge to the City's new Ordinance and Fee Schedule based on § 253(a) and (c) of the FTA.

### 2. Barriers to Entry

■■■ Read together, § 253(a) and (c) bar "all state and local regulations that

'prohibit or have the effect of prohibiting' any company's ability to provide telecommunications services unless the regulations fall within the statute's 'safe harbor'. provisions." *City of Auburn,* 247 F.3d at 980; *see also TCG New York, Inc. v. City of White Plains,* 125 F.Supp.2d 81, 87 (S.D.N.Y.2000) ("The structure and language of § 253 embodies the balance between Congress' 'new free market vision' and its recognition of the 'continuing need for state and local governments to regulate telecommunications providers on grounds such as consumer protection and public safety.'") (citing *Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston,* 184 F.3d 88, 98 (1st Cir.1999)).

Like the ordinances in *City of Auburn,* Berkeley's Ordinance requires all telecommunications carriers seeking to install telecommunications facilities in or on Berkeley's public rights-of-way to undergo a thorough application and permit process. Ordinance § 16.10.030. The carrier must first obtain registration and pay an annual registration fee of $3,400. *See* Ordinance § 16.10.040; Fee Schedule. A Special Telecommunications Permit is also required of all carriers, along with a $2,000 permit fee per project. *Id.* at § 16.10.050. As with registration, fees are charged to reimburse the City for its costs in processing the permit applications. *Id.* at § 16.10.100. Unless the carrier satisfies the City that it is exempt from franchising under § 16.10.070, the carrier must further obtain a license pursuant to § 16.10.090 and execute a written franchise pursuant to Chapter 9.60 of the Berkeley Municipal Code for "the privilege of using" the City's public rights-of-way. *Id.* These requirements stand in addition to any other requirements imposed by federal, state or local law, including existing excavation and encroachment permits under Title 16 of the Berkeley Municipal Code. Id. at § 16.10.030(A)(6). After permission to proceed is granted, the Ordinance maintains regulations concerning the installation, maintenance, operation, removal and upgrade of any equipment or facilities installed, including record-keeping, reporting, insurance, indemnity, and financial requirements. *Id.* at §§ 16.10.250–300.

After all required information is disclosed, the City is required to provide reasonable advance notice to affected members of the public and hold a public hearing. *Id.* at § 16.10.080(B). A final decision is within the discretion of the City, which ultimately considers the following additional criteria: 1) the legal and technical ability of the carrier; 2) the capacity of the affected public right-of-way to accommodate the proposed encroachment and any further utility and telecommunications facilities; 3) the damage or disruption to public or private facilities, improvements, and aesthetics; 4) the public interest in minimizing the cost and disruption of construction within the public right-of-way; 5) the availability of alternate routes or locations for the proposed encroachment; 6) the aesthetic and blighting effect of any above-ground encroachment; and 7) convictions or findings by any governmental authority that the applicant has violated any law or ordinance. *Id.* at § 16.10.080(C). In addition, if a carrier is not entitled to exemption from the licensing and franchise requirements, the City further considers: 1) the service that the carrier will provide to the community and region, 2) the effect on public health, safety and welfare, and 3) "such other factors—as may demonstrate that the grant to use the PROW will serve the community interest." The "other factors" are never identified. *Id.* at § 16.10.110.

The Ordinance vests significant discretion in the City to grant or deny permission to use its public rights-of-way based on an open-ended set of criteria and re-

quirements. In addition to the numerous disclosure requirements for registration and permits, the City is authorized to require any other information that it deems necessary, Ordinance §§ 16.10.40 and 16.10.060, and may cease processing an application if a carrier fails to satisfy these requirements. *Id.* at § 16.10.080(C)(8). Any violation of the Ordinance allows the City to revoke or terminate a carrier's registration, permit or license, and franchise. *Id.* at § 16.10.400. Furthermore, a violation of the Ordinance may also incur criminal and civil sanctions. *Id.* at § 16.10.420.

The Court finds that the Ordinance imposes an onerous burden on any carrier which seeks entry into the telecommunications market in Berkeley. Except for the license and franchise requirements, all other requirements under the Ordinance are absolute prerequisites to entry. The license and franchise requirements, which are even more onerous, presumptively apply unless a carrier proves to the City's satisfaction that it is exempt. Taken individually, many of the requirements under the Ordinance "have the effect of prohibiting entry" of telecommunications services providers. Viewed in its totality, the Ordinance creates a substantial barrier to entry.

The Court concludes that Qwest has demonstrated a substantial likelihood of success on its claim that § 253(a) of the FTA preempts Berkeley's new Ordinance. The Ordinance cannot stand unless it falls within the safe harbor provision of § 253(c).

**3. Reasonableness of Regulations and Fees**

■■■■■ Section 253(c) allows local governments to regulate management of public rights-of-way. "Congress [ ] recognized the continuing need for state and local governments to regulate telecommunica-

tions providers on grounds such as consumer protection and public safety, which are separate from any intent to create or maintain barriers to entry." *Cablevision of Boston,* 184 F.3d at 98. In determining the scope of a city's authority to regulate public rights-of-way, the Ninth Circuit looked to the Federal Communications Commission, which has stated:

> Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way .... [T]he types of activities that fall within the sphere of appropriate rights-of-way management ... include coordination of construction schedules, determination of insurance bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.

*City of Auburn,* 247 F.3d at 982 (quoting *In re TCI Cablevision of Oakland County, Inc.,* 12 F.C.C.R. 21396, ¶ 103 (F.C.C. 1997)). The Ninth Circuit also considered statements made by Senator Dianne Feinstein during the floor debate on § 253(c). Senator Feinstein stated that § 253(c) would permit requirements that:

> (1) 'regulate the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts' (2) 'require a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies,' (3) require a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated

excavation, (4) 'enforce local zoning regulations,' and (5) 'require a company to indemnify the City against any claims of injury arising from the company's excavation.'

*Id.* at 982 (quoting *In re Classic Telephone, Inc.,* 11 F.C.C.R. 13082 (F.C.C. 1996), ¶ 39 (quoting 141 Cong. Rec. § 8172 (daily ed. June 12, 1995))). Ultimately, "right-of-way management means control over the public rights-of-way itself, not control over companies with facilities in the right-of-way." *Id.* at 982.

Berkeley's Ordinance exceeds the permissible scope of regulating public rights-of-way. The Ordinance imposes a lengthy application and permit process which requires detailed disclosures. Under the registration and permit provisions, all carriers must disclose: 1) the identity and legal status of the carrier, 2) a map of the location of and a description of the carrier's existing and proposed encroachments within the City, 3) a description of the services the carrier already provides and services it intends to provides, 4) a three-year business plan and construction plan for proposed telecommunications service activities within the City, 5) the carrier's technical qualifications, experience and expertise, 6) information to establish that the carrier has obtained all other required governmental approvals and permits, 7) all convictions or findings by a governmental authority that the carrier has violated any law or ordinance, license agreement or franchise agreement, and 8) all other information that the City may reasonably deem necessary. *See* Ordinance §§ 16.10.040 and 16.10.060.

The Ordinance also requires that all carriers permitted to use its public rights-of-way maintain and submit detailed reports and records which do not appear to be related to permissible regulation. The reports must include the names and addresses of every person or entity that has en-

tered into any agreement which authorizes the use of the carrier's telecommunications facilities in the City. Ordinance § 16.10.260(B)(1). The City also has the right to inspect all carrier's records, books and other data concerning the carrier's business and operations for at least the preceding 3 years arising from its telecommunications services under the City's public rights-of-way. *Id.* at § 16.10.270(A) and (E). If it wishes, the City has the power to hire an outside certified public accountant or other business expert to review the carrier's records. *Id.* at § 16.10.270(C).

As the Ninth Circuit held, a carrier's financial, technical and legal qualifications to provide service are not relevant to a city's management of its public rights-of-way, and cities cannot collect information about the description of telecommunications services to be provided or a carrier's future business and construction plans. *City of Auburn,* 247 F.3d at 982–83. Furthermore, the broad discretion vested in the City to grant, deny, modify or revoke a carrier's access to the telecommunications market on the basis of unrelated and open-ended criteria is not permissible under § 253(c). *Id.* at 983–84.

The foregoing requirements apply to all telecommunications carriers, whether or not exempt under federal or state law. This wholly undermines the City's effort to save the Ordinance by emphasizing the Ordinance's exemption provision. *See* Deft.'s Suppl. Brief 12–15. The City argues that under the Ordinance, a telecommunications carrier is not required to obtain a license and franchise agreement if it satisfies the City that it is exempt under federal or state law. Ordinance § 16.10.070. According to the City, the Ordinance is "specifically designed to allow the City to ascertain at an early stage whether and to what extent a telecommu-

nications provider is protected by federal or state law." Deft.'s Suppl. Brief 12:24–26. An exempt carrier is only subjected to "minimal regulation based upon the City's legitimate interest in its public rights of way." *Id.* at 12:19.

However, the provisions of the Ordinance described in the preceding paragraphs are imposed on *all* telecommunications services providers, not just nonexempt licensees and franchisees. Moreover, the Ordinance is drafted to presume that a license and franchise requirement applies to any applicant, unless the applicant proves that it is exempt. This scheme itself imposes an unnecessary barrier to entry. The determination whether a carrier is exempt involves further onerous disclosures and ultimately rests within the City's discretion. *See* Administrative Guideline No. 1 Re: Determination of Exemption (attached at Supplemental Declaration of Phil Kamlarz, Ex. A). The Court finds that Qwest is substantially likely to succeed on its claim that the Ordinance fails to fall within the protection of § 253(c) allowing regulation of the City's public rights-of-way.

 Qwest also challenges the imposition of particular fees under the Fee Schedule as not reasonably related to the regulation of public rights-of-way permitted under § 253(c). In regulating public rights-of-way pursuant to § 253(c), local governments are allowed to "require fair and reasonable compensation from telecommunications providers ... for use of public rights-of-way." Fees charged against telecommunications carriers must be directly related to the carrier's actual use of the local rights-of-way. *See New Jersey Payphone Ass'n, Inc. v. Town of West New York*, 130 F.Supp.2d 631, 638 (D.N.J.2001) ("Plainly, a fee that does more than make a municipality whole is not compensatory in the literal sense, and risks becoming an economic barrier to en-

try."); *Bell Atlantic–Maryland v. Prince George's County*, 49 F.Supp.2d 805, 817 (D.Md.1999) ("[L]ocal governments may not set their franchise fees above a level that is reasonably calculated to compensate them for the costs of administering their franchise programs and of maintaining and improving their public rights-of-way.").

Berkeley's Fee Schedule aims "to recover all reasonable costs associated with the City's activities needed to regulate the installation, operation, and maintenance of systems and equipment of telecommunication carriers within the City limits." Fee Schedule at 3 (attached at Compl., Ex. C). There are two categories of fees imposed: cost-recovery fees and annual rent compensation rates. Cost-recovery fees seek to recover costs "for the implementation and administration of the City's new Telecommunications Ordinance." *Id.* These costs include 1) an Ordinance Surcharge amounting to "upfront costs" for developing and implementing the Ordinance, 2) an Annual Registration Fee to recover ongoing administrative costs "to process and monitor all aspects of the [regulatory] program," and 3) a Permit and Inspection Fee to cover the costs of processing permit applications and conducting site inspections. *Id.* at 1–4. The annual rent compensation rates seek recovery "for use of the public right-of-way owed by telecommunications carriers." *Id.* at 1. A carrier must pay rent compensation only if it is required to obtain a license and franchise. Because common carriers would be exempt from these charges, the Court focuses only on the reasonableness of the cost-recovery fees.

The cost-recovery fees attempt to recoup costs in administering and implementing the Ordinance. The City has submitted a detailed explanation of calculations and considerations supporting each

of the fees. *See* Declaration of Phil Kamlarz ("Kamlarz Decl.") ¶¶ 27–34. Qwest offers no evidence to refute these calculations. On the present record, the Court cannot find that the cost-recovery fees are likely to be found invalid under § 253(c). However, this determination is not dispositive to the motion before the Court, given the foregoing conclusions that the Ordinance itself creates barriers to entry in violation of § 253(a) that do not fall within the safe harbor provision of § 253(c).

**4. Preemption Under California Law**

▮ Qwest also asserts claims under California Public Utilities Code §§ 7901 and 7901.1, and the California Telecommunications Infrastructure Development Act, Gov.Code § 50030, arguing that these statutes preempt the Ordinance and Fee Schedule. The California Constitution and state statutes have vested exclusive jurisdiction in the Public Utilities Commission to regulate the conditions under which public utilities render their services. *See* Cal. Const. art. XII, § 8; *Harmon v. Pacific Tel. & Tel. Co.*, 183 Cal.App.2d 1, *2–3, 6 Cal.Rptr. 542 (1960).

▮ Section 7901 of the Public Utilities Code "constitutes 'a continuing offer extended to telephone and telegraph companies which offer when accepted by the construction and maintenance of lines' gives a franchise from the state to use the public highways for the prescribed purposes without the necessity for any grant by a subordinate legislative body." *Pacific Tel. & Tel. Co. v. City & Cty. of San Francisco*, 51 Cal.2d 766, 771, 336 P.2d 514 (1959) (citing *County of Los Angeles v. Southern Cal. Tel. Co.*, 32 Cal.2d 378, 384, 196 P.2d 773 (1948)). This statute has been interpreted to insulate telephone companies from franchise requirements imposed by local governments for use of public land to lay lines and equipment. *See City of Petaluma v. Pacific Tel. & Tel.*

*Co.*, 44 Cal.2d 284, 289, 282 P.2d 43 (1955) (city cannot compel telephone company to obtain a municipal franchise to use the streets and other public places for its lines and equipment); *City of San Diego v. Southern Cal. Tel. Corp.*, 42 Cal.2d 110, 116, 266 P.2d 14 (1954) ("When a telephone corporation obtains a franchise under section [7901], it need not obtain a franchise from local authorities."). Local governments instead are authorized only to "exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed." Cal. Pub. Util.Code § 7901.1(a); *Pacific Tel. & Tel. Co. v. City and County of San Francisco*, 197 Cal.App.2d 133, 152, 17 Cal.Rptr. 687 (1961) ("Thus, because of the state concern in communications, the state has retained to itself the broader police power of granting franchises, leaving to the municipalities the narrower police power of controlling location and manner of installation.").

A much newer statute, the California Telecommunications Infrastructure Development Act, requires that any permit fee imposed for the placement, installation, repair, or upgrading of telecommunications facilities "shall not exceed the reasonable costs of providing the service for which the fee is charged and shall not be levied for general revenue purposes." Cal. Gov. Code § 50030. Read together, the statutes govern what sort of local regulation and fees would be permissible under California law.

However, relevant case law is sparse. Qwest did not cite, and the Court could not find, any cases addressing the meaning of the state telecommunications act. Moreover, the cases interpreting § 7901 of the Public Utilities Code date back at least 40 years and are mostly inapposite to the facts here. The one relevant case, *City of Petaluma*, involved preemption of an out-

right attempt to impose a franchise on a telephone company. Here, the franchise and license provision of the Ordinance are subject to exclusion if an applicant proves that it is exempt. It is not clear that such a scheme violates § 7901, nor that the Ordinance as a whole conflicts with the state telecommunications act.

Given the ambiguity and novelty of some of the state law questions presented, the Court declines to exercise supplemental jurisdiction over Qwest's state preemption claim. *See* 28 U.S.C. 1367(c)(1) (district courts may decline to exercise supplemental jurisdiction if the claim raises a novel or complex issue of state law); *City of Auburn,* 247 F.3d at 978–80 (declining review of question whether local telecommunications ordinances violate new Washington laws where issues were matter of first impression and no state court had published an opinion addressing the new law).

### 5. Severability

The Ordinance contains a severability clause which attempts to separate any provision that is declared invalid or unconstitutional. Ordinance § 16.10.380. In order to determine whether invalid portions of an ordinance are severable, it is necessary to look to California law. *See City of Auburn,* 247 F.3d at 985–86 (citing *Leavitt v. Jane L.,* 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996)). Under California law, a statute that is invalid is not ineffective and inoperative to the extent that its invalid parts can be severed from any valid ones. *Hotel Employees and Restaurant Employees Intern. Union v. Davis,* 21 Cal.4th 585, 613, 88 Cal. Rptr.2d 56, 981 P.2d 990 (1999). An offending provision can be severed from an ordinance if the provision is grammatically, functionally, and volitionally separable. *Calfarm Ins. Co. v. Deukmejian,* 48 Cal.3d 805, 821, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989).

The provision is grammatically severable if it is distinct and separate and, hence, "can be removed as a whole without affecting the wording of any" of the measure's other provisions. *Hotel Employees,* 21 Cal.4th at 614, 88 Cal.Rptr.2d 56, 981 P.2d 990 (citing *Calfarm,* 48 Cal.3d at 822, 258 Cal.Rptr. 161, 771 P.2d 1247). It is functionally severable if it is not necessary to the measure's operation and purpose. *Id.* Finally, it is "volitionally" severable if it was not of critical importance to the measure's enactment. Id. "The final determination depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute." *Calfarm,* 48 Cal.3d at 821, 258 Cal.Rptr. 161, 771 P.2d 1247.

It is not possible to sever the many provisions and portions of the Ordinance that appear to be preempted by the FTA. The entire application process and registration and permit requirements are rife with invalid requirements. Striking these requirements would render the remainder of the Ordinance awkwardly disjointed and confusing. Moreover, elimination of the many offending disclosure requirements would vitiate the sort of decision-making originally intended by the City in determining whether to permit use of its public rights-of-way. The Fee Schedule is inseparably tied to the registration and permit requirement, and likewise, could not stand if those provisions were deleted. These many factors require that the Court enjoin the entirety of the Ordinance. *See City of Auburn,* 247 F.3d at 985 ("'[O]rdinances contain a complex mix of application procedures, approval requirements, required franchise terms, financial and operations disclosure, and discretionary 'catchall' clauses whose preempted provisions are so pervasive that . . . . [severability of offending provisions] would result in regulation requiring a disjointed franchise applica-

tion, a lack of standards for approval, disapproval or revocation by the cities, and cross-references leading the reader to non-existent provisions.").

## B. Irreparable Injury and Balance of Interests

 Having found that Qwest has demonstrated a substantial likelihood of success on the merits, the Court must next determine whether Qwest faces a probability of immediate irreparable harm. Qwest argues that it is suffering irreparable harm to its goodwill and reputation within the telecommunications industry. Established in 1997, Qwest's Government Systems Division is relatively new to the telecommunications market. Richeson Decl. ¶ 17. The LBN Laboratory contract is Qwest's second largest nonclassified governmental contract. *Id.* Its procurement of the contract has enhanced Qwest's reputation, but Qwest claims that its ability to secure future business is heavily dependent on its performance under this contract. *Id.* According to Qwest, continued delay in completing the conduit link will irreparably harm its goodwill and reputation as well as the reputation of LBN Laboratory as the ESNET administrator. *Id.;* Declaration of Jim Leighton ("Leighton Decl.") ¶ 16. At oral argument, counsel represented that Qwest will lose the contract if it does not have LBN Laboratory operational by around September 2001.

 Injury to a business's goodwill and reputation is not easily measurable, and thus supports a finding of irreparable harm. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.") (citing *Regents of Univ. of Cal. v. American Broadcasting Cos.,* 747 F.2d 511, 519–20 (9th Cir.1984)); *AT & T Communications v. City of Dal-*

*las,* 8 F.Supp.2d 582, 594 (N.D.Tex.1998) (lost revenues, loss of customers and goodwill "would be very difficult to calculate for the purposes of monetary damages"). The Court is satisfied that Qwest has demonstrated a probability of immediate irreparable harm.

The Court also recognizes the harm to LBN Laboratory and the ESNET by Qwest's delay in finishing construction of its conduit. *See* Richeson Decl. ¶¶ 11–14; Leighton Decl. ¶¶ 11–16. The delay in upgrading LBN Laboratory's link to the ESNET hampers the network's full capacity, which in turn may affect government-based or sponsored research endeavors. Leighton Decl. ¶¶ 14–15. By contrast, any injury incurred by the City if its Ordinance were enjoined would not compare to the present harm to Qwest and LBN Laboratory. The City argues that "the legislative authority of the City would effectively be usurped by the court" if a preliminary injunction issued nullifying the Ordinance. Oppo. to Prelim. Inj. 25:12–13. However, the City is free to legislate provided it does so within the constraints of federal and state law.

## C. Appropriate Relief

 In addition to a preliminary injunction nullifying the Ordinance and Fee Schedule, Qwest requests an affirmative order compelling the City to issue all necessary permits for installation of the LBN Laboratory conduit. Motion for Prelim. Inj. 25:14–17. The City objects to the proposed relief, asserting that "the appropriate remedy would not include automatic, reckless, and wholly uninformed permitting of an undisclosed and potentially environmentally significant project." Oppo. to Prelim. Inj. 21:13–15. The City argues that Qwest has not complied with all requirements for excavation permitting under its Municipal Code and has not com-

plied with environmental certification requirements.

According to the City, Qwest failed to comply with established application procedures to obtain a permit for excavation, even before the new Ordinance took effect. Many of the facts relating to this issue are in dispute. Qwest commenced plans for installation of the LBN Laboratory conduit in March 2000. Declaration of Crispin Kurbanick ("Kurbanick Decl.") ¶¶ 5–6. Working with an independent engineering firm to finalize details on the plan, Qwest submitted a formal application to the Berkeley City Inspector on July 10, 2000. Kurbanick Decl. ¶ 10. The City claims that it continued to work with Qwest to complete an application for permitting, but that Qwest refused to disclose information necessary to the application. Declaration of Phil Kamlarz ("Kamlarz Decl.") ¶¶ 14–18. Qwest's partial and non-responsive disclosures, according to the City, prevented a permit from being granted. *Id.* at ¶ 16. Qwest argued that the information sought was confidential and was not needed by the City to grant a permit. *See* Declaration of Wesley Skow ("Skow Decl."), Ex. I.

Another completed application packet was sent to the City Inspector on October 4, 2000. Declaration of Tim Richardson ("Richardson Decl.") ¶ 12. The parties met again on October 12, 2000, when the City offered to grant the permit if Qwest agreed to pay all fees and charges applicable under the new Ordinance and waived its right to challenge the Ordinance. Kamlarz Decl. ¶ 20; Skow Decl. ¶¶ 18–19. Qwest did not agree to the waiver of its rights to challenge the new Ordinance. Instead, after further discussion with the City Inspector, Qwest made a final offer to the City. Skow Decl. ¶ 22 and Ex. H. This offer was based on final drawings and plans submitted to the City Inspector on December 6, 2000, incorporating all suggestions and requirements the City Inspector had communicated to Qwest up until that time. Richardson Decl. ¶ 14 and Ex. D. The City rejected Qwest's offer, citing incomplete disclosures and non-responsive answers to information that was still required. Skow Decl., Ex. I.

Qwest claims that it has provided the City Inspector all plans and drawings for construction and traffic-flow, a Certificate naming the City as an additional insured under Qwest's liability insurance policy, a map of the Pacific Bell conduit within the City's borders through which Qwest will be pulling the ESNET line, and a faithful performance bond. Richardson Decl. ¶ 15. According to Qwest, this information completes the required disclosures to obtain general excavation and encroachment permits under the Berkeley Municipal Code.

The facts indicate that Qwest was not dilatory in seeking a permit from the City, and the City did not arbitrarily delay review of Qwest's application. Rather, the impasse arose from disagreement over what information should be disclosed. However, much of the information the City sought was justifiably refused by Qwest because it was not related to the City's management of its public rights-of-way. By comparison, none of this information is requested in permit applications for general excavation and encroachment of rights-of-way under other provisions of the Berkeley Municipal Code. *Compare* Skow Decl., Ex. E (Qwest's permit application) *with* Berkeley Municipal Code § 16.12 (authorization for excavations) and § 16.18 (authorization for encroachment on public rights of way).

■ The Court is not persuaded by the City's remaining argument that Qwest must obtain certification under the California Environmental Quality Act ("CEQA"). Trenching of 4,300 feet of a public right-of-way probably does not qualify as a "pro-

ject" to trigger CEQA. *See* Cal. Publ. Res. Code § 21065 (defining "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment."). Moreover, the Court agrees with Qwest that CEQA does not apply here because approval of the excavation project under the City's general excavation permit process involves a ministerial act. *See* Berkeley Municipal Code § 16.12. CEQA review does not apply to projects approved by a ministerial act. Cal. Pub. Res.Code § 21080(b); *Prentiss v. City of South Pasadena,* 15 Cal.App.4th 85, 89–90, 18 Cal.Rptr.2d 641 (1993).

It appears that Qwest has filed applications for excavation and encroachment permits in accordance with the Berkeley Municipal Code. *See* Richardson Decl., ¶¶ 6–7; Berkeley Municipal Code §§ 16.12 and 16.18. These provisions govern the LBN Laboratory project and thus present an existing procedure for Qwest to obtain the necessary permits to begin laying its conduit. Although it appears that Qwest has provided the City with all the information needed to grant permits under §§ 16.12 and 16.18, the Court does not feel that an order compelling issuance of the permits is appropriate. These general permit procedures are not implicated by this order, and the Court sees no reason to compel an affirmative act from the City under these circumstances. The better choice is to presume that Qwest has met all obligations to receive the excavation and encroachment permits under §§ 16.12 and 16.18, but allow the City to show cause why permits should not be ordered.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendant's motion to dismiss [Docket No. 13] and GRANTS plaintiff's motion for preliminary injunction [Docket No. 3].

IT IS HEREBY ORDERED that the City of Berkeley is enjoined from enforcing the Telecommunications Carriers Ordinance, Berkeley Municipal Code § 16.10 et seq., and its accompanying Fee Schedule, pending resolution of this lawsuit.

IT IS FURTHER ORDERED that, within 10 days of this order, the City of Berkeley SHOW CAUSE why the Court should not order the issuance of excavation and encroachment permits under the Berkeley Municipal Code §§ 16.12 and 16.18 for Qwest's construction plans as laid out in the materials sent to the City on December 6, 2000.

**IT IS SO ORDERED.**