QWEST COMMUNICATIONS
CORPORATION,
Plaintiff,

v.

The CITY OF BERKELEY,
et al., Defendants.

No. C 01–0663 SI.

United States District Court,
N.D. California.

April 30, 2002.

Peter A. Wald, Stephan E. Klein, Janis L. Workman, Randall T. Kim, Latham & Watkins, San Francisco, CA, David R. Goodnight, Rita Latsinova, Dorsey & Whitney, LLP, Seattle, WA, for plaintiff.

William M. Marticorena, Jeffrey Melching, Rutan & Tucker, Costa Mesa, CA, Manuela Albuquerque, Zach Cowan, City of Richmond, Office of City Attorney, Richmond, CA, Bruce Soublet, Berkeley City Attorney's Office, Berkeley, CA, for defendants.

## ORDER DENYING MOTIONS FOR JUDGMENT ON THE PLEADINGS AND DENYING MOTION FOR TEMPORARY STAY OF DISCOVERY

ILLSTON, District Judge.

On April 12, 2002, the Court heard argument on plaintiff's motions for judgment on the pleadings and motion for temporary stay of discovery. Having carefully considered the arguments of the parties and the papers submitted, the Court hereby DENIES plaintiff's motion for judgment on the pleadings; DENIES plaintiff's motion for judgment on the pleadings re: the Interim Ordinance; and DENIES plaintiff's motion for a temporary stay of discovery for the reasons set forth below.

### BACKGROUND[1]

Plaintiff Qwest Communications Corporation ("Qwest") is a telephone company defined as a public utility under California Public Utilities Code § 216. FAC, ¶ 4. The California Public Utilities Commission ("PUC") has granted Qwest certificates of public convenience and necessity ("CPCN") to provide interexchange, or long distance, telecommunication services. Id. Qwest provides broadband Internet-based data, voice and image connectivity to businesses, consumers and other communications service providers. Id. at ¶ 28.

In December 1999, Qwest won a competitive bidding process and entered into a government contract to provide faster and expanded telecommunications capacity to the Lawrence Berkeley National Laboratory ("LBN Laboratory"). Id. at ¶ 30. LBN Laboratory is the technical administrator and central hub of a program operated by the United States Department of Energy ("DOE") known as the Energy Sciences Network ("ESNET"). Id. at ¶ 21. The ESNET is a high-speed communication network that allows Department of Energy researchers and collaborators throughout the nation access to a community of research facilities, resources and information. Id. at ¶ 22.

In order to upgrade LBN Laboratory's telecommunications capacity, Qwest must install a "local loop" between LBN Laboratory and Qwest's central system. Id. at ¶ 31. This involves constructing a conduit—"a pipeline of sorts"—through which fiber optic cable is strung. Id. at ¶ 32. Sometime in March 2000, Qwest began to formulate a construction plan to lay its conduit through public rights-of-way in the City of Berkeley ("City" or "Berkeley"). Id. at ¶ 32. Qwest met and communicated with city officials from April through December 2000 to negotiate an acceptable construction plan to encroach upon the City's public rights-of-way.

---

1. This factual background is drawn in large part from the May 23, 2001 preliminary injunction ruling. See Qwest Communications Corp. v. City of Berkeley, 146 F.Supp.2d 1081, 1105 (N.D.Cal. 2001).

*See id.* at ¶¶ 33, 35, 41–45. The parties were unable to agree, and Qwest consequently did not obtain the necessary permits to begin construction. Qwest claims that the City refused to process its application after July 10, 2000, pursuant to a *de facto* moratorium on telecommunications infrastructure construction pending enactment of an ordinance affecting installation of telecommunication services in Berkeley. *Id.* at ¶¶ 35–40.

On December 22, 2000, Berkeley enacted Ordinance No. 6608–N.S. (codified at Berkeley Municipal Code §§ 16.10 et seq.) ("Ordinance"), effective January 21, 2001. *Id.* at ¶ 46. On January 23, 2001, the City passed a Fee Schedule to accompany the Ordinance. *Id.* at ¶ 48. The Ordinance creates a comprehensive scheme intended "to more specifically regulate Telecommunications carriers providing telecommunications services using public rights of ways and other public property." Ordinance § 16.10.010 (attached at FAC, Ex. B).

The Ordinance applies to all telecommunications carriers seeking to encroach upon Berkeley's public rights-of-way to provide telecommunication services. Ordinance § 16.10.030. All carriers must first obtain registration and pay related registration fees, which must be updated annually. *Id.* at § 16.10.040; *see also* Fee Schedule 2–3 (attached at FAC, Ex. C). All carriers must also obtain a Special Telecommunications Permit pursuant to § 16.10.050 of the Ordinance and pay additional fees. *See also* Fee Schedule 3–4. Unless a carrier claims exemption under § 16.10.070, and the City affirmatively determines that an exemption does indeed apply, all carriers are subject to a franchise fee to provide telecommunications services using the City's public rights-of-way. *See also id.* 5–7.

Qwest filed this lawsuit against the City on February 13, 2001, seeking primarily to invalidate the new Ordinance and Fee Schedule pursuant to the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, and the "conflict with general laws" provision of the California Constitution. Cal. Const. art. XI, § 7. According to Qwest, Berkeley's Ordinance is preempted by the Federal Telecommunications Act of 1996 ("FTA"), 47 U.S.C. §§ 253(a) and (c), the California Public Utilities Code §§ 7901 and 7901.1, and California Government Code § 50030. Qwest also asserted claims of violations of the Fourteenth Amendment and Commerce Clause, brought pursuant to 42 U.S.C. § 1983; intentional interference with contractual relationship; ultra vires conduct; and a claim for declaratory judgment of its rights with respect to the City's Ordinance and Fee Schedule.

On May 23, 2001, this Court enjoined Berkeley from enforcing the Telecommunications Carriers Ordinance, Berkeley Municipal Code § 16.10 et seq., and its accompanying Fee Schedule, pending resolution of this lawsuit based in large part upon its finding that the Ordinance creates barriers to entry in violation of § 253(a) that do not fall within the safe harbor provision of § 253(c). *Qwest Communications Corp.*, 146 F.Supp.2d 1081. This Court also declined to exercise supplemental jurisdiction over Qwest's state preemption claim. *Id.* at 1101–02. Soon afterwards, Berkeley passed Resolution No. 61,102–N.S., adopting Ordinance No. 6630–N.S. and its accompanying Fee Schedule to regulate telecommunications companies "pending resolution of the legality of the City's current telecommunication ordinance." FAC, Ex. D. ("Interim Ordinance").

Qwest finds fault with a number of provisions of this Interim Ordinance and Fee Schedule, and maintains that, like its predecessor, it imposes an unlawful "third tier" of regulation that is prohibited by both the FTA and California's telecommunications statutes. Accordingly, Qwest filed a first amended complaint challenging this Interim Ordinance and adding new claims. Qwest also added a new cause of action arising directly under § 253 of the FTA and included § 253 as a substantive basis for its cause of action under 42 U.S.C. § 1983. In an Order dated November 15, 2001, this Court dismissed Qwest's claim for relief under § 253, holding that no implied private right of action exists directly under that provision of the FTA.

Now before the Court are plaintiff's motions for judgment on the pleadings under Rule 12(c) relating to both the Ordinance and

the Interim Ordinance, respectively. Qwest asks this Court to invalidate both the Ordinance and the Interim Ordinance as preempted by the FTA and California telecommunications statutes. Also before the Court is plaintiff's motion for temporary stay of discovery pending resolution of the motions for judgment on the pleadings.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c),

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Rules 12(b)(6) and 12(c) are substantially identical; both permit challenges to the legal sufficiency of the opposing party's pleadings. William W. Schwarzer et al., *Federal Civil Procedure Before Trial*, § 9:319. However, unlike Rule 12(b)(6), a Rule 12(c) motion for judgment on the pleadings may be made by either party. A plaintiff may move for judgment on the pleadings if the answer fails to controvert material facts alleged in the complaint. *Id.* at § 9:321. All allegations of fact by the party opposing the motion are accepted as true, and are construed in the light most favorable to that party. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir.1988). Uncontested allegations to which the other party had an opportunity to respond are taken as true. *Flora v. Home Fed'l Sav. & Loan Ass'n*, 685 F.2d 209, 211 (7th Cir.1982).

Judgment on the pleadings is appropriate when, even if all material facts in the pleading under attack are true, the moving party is entitled to judgment as a matter of law. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir.1989). A motion seeking judgment on the complaint may only be granted if all of the defenses raised in the answer are legally insufficient. Schwarzer, *supra*, at § 9:328. A plaintiff is not entitled to judgment on the pleadings if the answer raises issues of fact or an affirmative defense which, if proved, would defeat plaintiff's recovery. *General Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir.1989). Generally, a court may consider only allegations made in the complaint and the answer; extrinsic factual material may not be taken into account. *Powe v. Chicago*, 664 F.2d 639, 642 (7th Cir.1981). However, materials properly attached to a complaint as exhibits may be considered. *Amfac Mortg. Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 429 & n. 2 (9th Cir.1978); Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). Rule 12(c) itself and supporting case law indicate that if matters outside the pleadings are presented to and not excluded by the court, the motion for judgment on the pleadings is converted into a Rule 56 summary judgment motion. Schwarzer, *supra*, § 9:339; *Hal Roach Studios, Inc.*, 896 F.2d at 1550. The fact that such extrinsic material was submitted to the court does not automatically convert a motion for judgment on the pleadings into one for summary judgment. It must appear that the court relied on the extrinsic evidence in reaching its conclusions before that conversion occurs. *Homart Dev. Co. v. Sigman*, 868 F.2d 1556, 1561–62 (11th Cir.1989).

## DISCUSSION

**I. MOTIONS FOR JUDGMENT ON THE PLEADINGS RE: ORDINANCE AND INTERIM ORDINANCE**

Relying in large part upon the Ninth Circuit's recent decision in *City of Auburn v. Qwest Corp.*, 260 F.3d 1160 (9th Cir.2001), Qwest moves for judgment on the pleadings on its preemption claims with respect to both the Ordinance and the Interim Ordinance. On May 23, 2001, this Court granted preliminary injunctive relief to Qwest, finding that Qwest was likely to prevail in its argument that the Ordinance is void under the Suprem-

acy Clause of the United States Constitution, and enjoining the City from enforcing the Ordinance. In the first of its two motions for judgment on the pleadings, Qwest now seeks judgment as a matter of law that the Ordinance is invalid under the Supremacy Clause of the United States Constitution. Qwest's arguments in this motion are substantially similar to those accepted by the Court at the preliminary injunction stage. In its second motion for judgment on the pleadings, Qwest argues that the Interim Ordinance, too, is invalid because it usurps the exclusive combined jurisdiction of the FCC and the State Public Utilities Commissions ("PUCs") over issues of common carriage and purports to regulate telecommunications companies themselves, rather than public rights-of-way.

Berkeley's chief argument in opposition to the two motions is that preemption cannot be decided when raised in a motion for judgment on the pleadings. Berkeley contends that facts are required for the preemption analysis under the FTA, that the bulk of the facts alleged in Qwest's complaint are contested in Berkeley's answer, and that consequently this Court may not make a preemption determination based upon the pleadings and the two Ordinances alone.[2] As will be explained below, the Court agrees with Berkeley that the preemption argument asserted by Qwest here cannot be resolved on the pleadings alone.[3]

### A. Preemption Analysis

The Supremacy Clause, U.S. Const. Art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to," federal law. *Gibbons v. Ogden,* 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23 (1824). Both of Qwest's motions for judgment on the pleadings require the Court to determine whether the two Ordinances are preempted by the FTA. Section 253 of the FTA reads, in pertinent part:

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

\*\*\*

(c) State and local government authority

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunication providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253. The Ninth Circuit has described the FTA preemption inquiry succinctly: "Section 253(a) bars all state and local regulations that 'prohibit or have the effect of prohibiting' any company's ability to provide telecommunications services unless the regulations fall within the statute's 'safe harbor' provisions." *City of Auburn,* 260 F.3d at 1175. "One of these safe harbors, established by § 253(c), allows a local government to manage and collect fees for the use of public rights-of-way by telecommunication providers." *Id.* at 1170. Analysis of the Ordinance and Interim Ordinance under this framework cannot be performed based upon the pleadings and the language of the Ordinances alone.

### 1. Common Carrier Status

■ As a threshold matter, Berkeley contends that the FTA does not apply to the LBN project at issue in this case. The FTA applies only to telecommunications services offered on a common carrier basis. *See Howard v. America Online, Inc.,* 208 F.3d 741, 751–53 (9th Cir.2000), *cert. denied* 531 U.S. 828, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000). In its complaint, Qwest alleges that it is a

---

**2.** The Ordinance and Interim Ordinance are attached to Qwest's First Amended Complaint. Neither party objects to consideration of these two documents. *See Amfac Mortg. Corp.,* 583 F.2d at 429 & n. 2.

**3.** A review of the file in this case reveals that Qwest initially planned to file a motion for summary judgment raising the preemption arguments asserted in the instant motions. As late as January 2002, stipulations filed by the parties indicated that the motions would be framed as motions for summary judgment.

common carrier as that term is defined by federal law. FAC, ¶ 4. Berkeley denies this allegation in its answer and intends to present evidence to prove that the specific project and services at issue in this litigation do not constitute "telecommunications services" within the meaning of § 253(a). Answer, ¶ 4.

At the preliminary injunction stage, this Court entertained argument regarding Qwest's standing to raise a preemption challenge to the Ordinance and addressed the issue in its opinion. *See Qwest Communications Corp.,* 146 F.Supp.2d at 1094–96. Berkeley argued that the FTA does not apply because Qwest's contract with LBN Laboratory was an agreement to provide services through individual negotiations in order to meet the customer's particular technological and marketing requirements. Upon consideration of the issue, the Court disagreed, based in large part on Qwest's representation that it offers high-speed telecommunications services on a nondiscriminatory basis to any other consumer who might find it useful and practical. The Court further noted that "[t]he City has brought forth no other evidence to dispute Qwest's showing that its contract with LBN Laboratory involves the offering of high-speed telecommunication services to a particular class of consumers on a nondiscriminatory, common carrier basis." *Qwest Communications Corp.,* 146 F.Supp.2d at 1096.[4] Berkeley now argues that, because discovery had not yet commenced, production of evidence to counter Qwest's evidence at the preliminary injunction stage was impossible. Berkeley has propounded discovery requests relevant to the question in order to challenge Qwest's standing.

There exist no uncontroverted facts in the pleadings alone sufficient to conclusively establish that the project at issue in this case is covered by the FTA. Accordingly, this threshold issue cannot be determined under the strictures of Rule 12(c).

### 2. Section 253(a)

■ In determining whether the two Ordinances are preempted under the Supremacy Clause, this Court is presented first with the question of whether the Ordinances "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 447 U.S.C. § 253(a). Only if the Court finds in the affirmative does it turn to a determination of whether the provision falls within the safe harbor of subsection (c). *City of Auburn,* 260 F.3d at 1177.

Qwest bears the burden of showing that the Ordinances are barred under § 253(a). *See New Jersey Payphone Ass'n, Inc. v. Town of West New York,* 130 F.Supp.2d 631, 636 (D.N.J.2001); *In re TCI Cablevision of Oakland County, Inc.,* 12 F.C.C.R. 21396, 21440 (1997). Qwest acknowledged that it bears this burden in its reply brief in support of its motion for preliminary injunction. Reply Brf., 6:7–8. This burden may not be met by simply averring in the complaint that the Ordinances either prohibit or have the effect of prohibiting the ability to provide service, then moving for judgment on the pleadings. Although it is well-established that preemption may be decided as a matter of law, the Court must consider more than the language of the Ordinances and the allegations of the complaint before it can make a meaningful determination that the Ordinances actually "prohibit or have the effect of prohibiting...." *See, e.g., BellSouth Telecommunications, Inc. v. City of Mobile,* 171 F.Supp.2d 1261, 1281 (S.D.Ala.2001) (recognizing that minor delays in obtaining permits may not constitute prohibition).

It is undisputed that, in passing the FTA, Congress intended to limit state and local regulation of telecommunication services. *See MCI Telecommm. Corp v. Bell Atl.–Pennsylvania,* 271 F.3d 491, 510–11 (3d Cir. 2001). Nevertheless, the language of the statute makes clear that Congress did not intend to bar states and localities from regulating this area entirely. As set forth above, Congress left room for regulations that do not "prohibit or have the effect of prohibiting" the ability to provide telecommunication services and those regulations that relate to management of public rights-of-way. *See*

---

4. The Court also concluded that "the facts and pleadings on record indicate Qwest has standing to raise a preemption challenge to the city's new ordinance and fee schedule based on § 253(a) and (c) of the FTA." *Qwest Communications Corp.,* 146 F.Supp.2d at 1096.

*TCG New York, Inc. v. City of White Plains,* 125 F.Supp.2d 81, 88 (S.D.N.Y.2000) (recognizing that § 253 was not intended to preempt all local action because "Congress could have achieved that result by simply preempting all local action in § 253(a)"). Because the line between acceptable and unacceptable state and local regulations is not altogether clear, courts and the FCC necessarily serve as arbiters, determining which state and local regulations run afoul of the FTA. Courts must be able to articulate clear bases for their decisions to either preempt or approve challenged regulations.[5] Were the Court to accept Qwest's argument that these cases can be routinely decided based on the pleadings alone, courts would be left to resort to mere speculation about the potential effects of regulations.[6]

At oral argument on the instant motions, counsel for Qwest acknowledged that discovery regarding the effect of a challenged ordinance might be appropriate where the ordinance only contains a few provisions alleged to run afoul of the FTA. Here, though, Qwest argues that the Ordinances contain a "bundle" of provisions, which, taken together, mandate a finding that the Ordinances are preempted based on the pleadings alone. This Court may well find, in the end, that the provisions of the Ordinances, taken together, create a substantial barrier to entry. Such a finding, however, cannot be made without any factual showing and prior to any meaningful discovery.

Indeed, the FCC, which is primarily responsible for enforcing the terms of the FTA, describes a fact-based inquiry used to determine whether a particular ordinance is preempted. In determining whether the ordinance has the effect of prohibiting the provision of telecommunication services, the FCC considers "whether the Ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *In the Matter of California Payphone Assoc.,* 12 FCC Rcd 14191, 14206 (1997). Providers challenging a regulation are required to "supply ... credible and probative evidence that the challenged requirement falls within the proscription of section 253(a)." *In the Matter of TCI Cablevision of Oakland County, Inc.,* 12 FCC Rcd 21396, 21440 (1997). The FCC requires petitioners to address, *inter alia,* the specific telecommunications services they are effectively prohibited from providing, and what other entities are prohibited from providing those services. Suggested Guidelines for Ruling Under Section 253 of the Federal Telecommunications Act, 13 FCC Rcd 22970, 22971–72 (1998). Of course, this Court is not obliged to follow guidelines established by the FCC in making a preemption determination, but the Court is persuaded that a preemption determination cannot be made without some evidence that the Ordinances actually have a prohibitive effect on any entity.

The cases Qwest relies upon to support its argument that it need not prove that the Ordinances have a negative impact on Qwest itself do little to support its overarching argument that the facts are irrelevant. Those cases stand for the proposition that, at the least, the Court must determine whether the Ordinances "prohibit or have the effect of prohibiting the ability of *any entity* to provide any interstate telecommunications service." 47 U.S.C. § 253(a) (emphasis added). *See, e.g., In re TCI Cablevision of Oakland County, Inc.,* 12 F.C.C.R. 21396, ¶ 98 (F.C.C.

---

5. Courts, including this one at the preliminary injunction stage, do not typically rule that every single aspect of a local ordinance is preempted. After discussing particular provisions of the Ordinances, the Court will be required to determine whether offensive provisions may be severed without affecting the wording of any of the Ordinances' other provisions. *See Hotel Employees and Restaurant Employees Intern. Union v. Davis,* 21 Cal.4th 585, 614, 88 Cal.Rptr.2d 56, 981 P.2d 990 (1999).

6. Qwest itself recognized that facts outside the pleadings are relevant to FTA preemption analysis when it argued the motion for preliminary injunction. Qwest submitted a number of declarations and exhibits in support of its motions, including declarations from two experts. One expert declaration concerned whether the Ordinance constituted a prohibition or effective prohibition on Qwest's provision of telecommunications services under § 253(a). Declaration of Robert E. Hall. A second expert was asked to examine the impact of Berkeley's fee structure. Declaration of William L. Fitzsimmons.

1997) ("In evaluating whether a state or local provision has the impermissible effect of prohibiting an entity's ability to provide any telecommunications service, we consider whether it 'materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment.' ") This is not a matter for pure speculation. While Qwest alleges in its First Amended Complaint that the Ordinances "prohibit or have the effect of prohibiting," Berkeley denies the allegation in its answer. Because Qwest is the moving party, the Court cannot simply accept its allegations regarding the effects of the Ordinances as true.[7]

Accordingly, Qwest must present evidence to establish the effect of the Ordinances. *See, e.g., Qwest Corporation v. City of Portland,* 200 F.Supp.2d 1250, 1256 (D.Or.2002) ("Because Qwest has failed to show that any of the Cities' challenged requirements individually or in combination bar competition or have the effect of prohibiting any telecommunications services, Qwest's claims against the Cities must fail."); *U.S. West Communications, Inc. v. Arizona Corp. Commission,* 198 Ariz. 208, 8 P.3d 396 (2000) ("Nothing in this record supports the claim that fair value rate base determinations are so costly or complex that they prohibit any of the Competitors from entering the Arizona telecommunications market."); *AT & T Communications of Pacific Northwest, Inc. v. City of Eugene,* 177 Or.App. 379, 409–10, 35 P.3d 1029 (2001) (rejecting preemption argument when complaint alleging prohibitive effect was not supported by evidence of actual or likely effect of the ordinance on plaintiffs or any other telecommunication providers).

Given the bar on consideration of extrinsic factual materials under Rule 12(c), this Court is left to rely solely upon the words of the Ordinances and the allegations in the pleadings. Berkeley denies every factual allegation made in the complaint related to the analysis under § 253(a). *See* Answer, ¶¶ 80–87. While this might not matter were the Court deciding this issue at summary judgment, because the Court is being asked to decide preemption in a Rule 12(c) motion by the plaintiff, factual averments disputed by Berkeley may not be accepted in this motion. Moreover, the Court must construe the pleadings and facts in a light most favorable to Berkeley, the non-moving party. *See General Conference Corp. of Seventh–Day Adventists,* 887 F.2d at 230.[8]

### 3. Section 253(c)

Assuming a finding that particular provisions of the Ordinances constitute effective bars to provision of telecommunication services, the question becomes whether those provisions fall within the safe harbor of § 253(c). Again, this question cannot be resolved in a motion for judgment on the pleadings. Pursuant to § 253(c), this Court must consider Berkeley's evidence regarding the connection between the challenged provisions and regulation of public rights-of-way. Berkeley asserts an affirmative defense in its answer claiming that the Ordinances relate to Berkeley's regulation of public rights-of-way and are, therefore, permissible under the FTA. Answer, ¶ 154. Berkeley bears the burden of proof on this issue and, because it claims that the Ordinances fit within the safe harbor in its answer, must be allowed to submit evidence to justify provisions of the Ordinance allegedly aimed at regulating public rights-of-way. Berkeley submitted, and this Court considered, evidence regarding this connection at the preliminary injunction

---

7. Berkeley oversteps when it implies that whether the Ordinances constitute effective barriers to entry and whether the Ordinances are related to management of rights-of-way are questions of fact. The Ninth Circuit has indicated that these issues may be decided by the court as a matter of law. *City of Auburn,* 260 F.3d at 1172. It is likely that the Court will ultimately determine the preemption question as a matter of law, but this determination will not be made in a factual vacuum.

8. This reasoning applies to the Court's preemption analysis of both the Ordinance and the Interim Ordinance. With respect to Qwest's arguments regarding the Common Carrier Exception procedure in the Interim Ordinance, the Court needs more than the text of the Interim Ordinance in order to determine whether, for example, evaluation of the "truth and accuracy" of the certification submitted by a telecommunications company actually involves second-guessing FCC Common Carrier Bureau or CPUC determinations. Interim Ordinance, § 16.11.070(d)(5).

stage. *See Qwest Communications,* 146 F.Supp.2d at 1100–01.

The Court cannot determine whether particular provisions are related to the management of public rights-of-way without evaluating the justifications for the provisions offered by Berkeley. The evaluation cannot be done on the pleadings alone. Because this motion was framed as one for judgment on the pleadings, the Court is required to assume that Berkeley will be able to produce facts to support its claim that the disputed provisions are related to management of public rights-of-way.

### B. *City of Auburn v. Qwest Corporation*

Qwest relies almost exclusively upon *City of Auburn* to support its position that adjudication of preemption claims based on the pleadings alone is proper. According to Qwest, the Ninth Circuit in that case established that district courts may make preemption findings without any reference to evidence outside the pleadings in a Rule 12(c) motion. Because *City of Auburn* provides the central foundation for Qwest's argument, a close examination of the case and its ramifications is in order.[9]

*City of Auburn* did not establish a per se rule that preemption under the FTA should be decided by district courts in motions for judgment on the pleadings. The case was taken up by the Ninth Circuit after the district court granted summary judgment to the city plaintiffs on a state law issue and dismissed Qwest's preemption claim as unripe after Qwest moved for judgment on the pleadings under Rule 12(c). Because the district court found that the preemption claim was not ripe, it did not analyze the claim on its merits. *City of Auburn,* 260 F.3d at 1166. On appeal, the Ninth Circuit

disagreed, then opted to take the unusual step of considering the preemption issue itself for the first time instead of remanding for consideration by the district court. *Id.* In deciding to consider the issue on appeal, the court held that the preemption claim presented a pure question of law. *Id.* at 1172. The court explained that "[n]o further factual record would narrow or clarify that issue." *Id.* More than anything, this analysis served as justification for taking the unusual step of resolving a question for the first time on appeal. The court relied upon a previous Ninth Circuit case, *Bibeau v. Pacific Northwest Research Foundation Inc.,* 188 F.3d 1105, 1111 n. 5 (9th Cir.1999), in which the court explained that "it is sometimes appropriate for an appellate court to pass on issues of law that the trial court did not consider."

In fact, nowhere in the opinion does the Ninth Circuit explicitly address Rule 12(c). The only reference to the Rule comes in a case cited by the court. Specifically, at the beginning of its preemption analysis under § 253, the Court explained that: "The question before the district court and on appeal is whether, on the facts alleged, Qwest is entitled to judgment as a matter of law. *See Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., Ltd.,* 132 F.3d 526, 529 (9th Cir.1997). We conclude that it is." *Id.* at 1175. The portion of the *Enron Oil Trading & Transp. Co.* case cited by the court sets forth the legal standard for adjudication of a Rule 12(c) motion. In the absence of any meaningful analysis by the Ninth Circuit of the ramifications of deciding preemption under Rule 12(c) in all cases, this Court is unpersuaded that this single citation constitutes a green light for district courts to decide preemption on the pleadings alone under all circumstances.

9. Plaintiff submitted for the Court's consideration copies of the cities' briefs filed with the Ninth Circuit and the cities' petition for writ of certiorari in *City of Auburn.* Declaration of David R. Goodnight. Berkeley objects to the declaration in its entirety on the grounds that the pleadings are nothing more than argument and are thus irrelevant; constitute inadmissible hearsay under Fed.R.Evid. 801–802; and are not properly recognizable as precedent or persuasive authority. Objections to Declaration of David R. Goodnight. Because plaintiff is moving for judg-

ment on the pleadings pursuant to Fed.R.Civ.P. 12(c), this Court must avoid reliance upon extrinsic evidence. *See Jacobson v. AEG Capital Corp.,* 50 F.3d 1493, 1496 (9th Cir.1995) ("In considering AEG's motions to dismiss, the district court took judicial notice of the extensive records and transcripts from the prior bankruptcy proceedings. (citation omitted) We therefore review the district court's dismissal as an order granting summary judgment."). The Court will not consider the Goodnight Declaration.

The cases relied upon by the Ninth Circuit in *City of Auburn* were almost exclusively decided on summary judgment and involved analysis of facts outside of the pleadings. For example, the *City of Auburn* court cited *AT & T Communications of the Southwest, Inc. v. City of Dallas,* 52 F.Supp.2d 763 (N.D.Tex.1999), several times. In that case, the court initially enjoined enforcement of the ordinance at issue and ultimately granted summary judgment in favor of the telecommunication providers. The district court explained in evaluating whether a disputed franchise requirement fit within the § 253(c) safe harbor, that "[t]he City has presented no evidence that connects its franchise requirement with the management of and compensation for the use of its rights-of-way. Absent such evidence, there is no genuine issue of material fact as to the preemption of the City's franchise requirement imposed on AT & T." *Id.* at 770. The obvious implication is that evidence submitted by the city regarding the connection between the franchise requirement with the management of rights-of-way might warrant a finding of no preemption. At the preliminary injunction stage, this Court followed similar logic. The Court was unable to find that Berkeley's cost-recovery fees were likely to be found invalid under § 253(c) because Berkeley "submitted a detailed explanation of calculations and considerations supporting each of the fees." *Qwest Communications Corp.,* 146 F.Supp.2d at 1100–01. Were this Court to decide this motion under Rule 12(c), it would be barred from considering such evidence. In another case relied upon by the *City of Auburn* court, a district court found based on stipulated facts that challenged regulations violated § 253(a) because it had been established that the process of obtaining a franchise was a "lengthy and complex negotiation between the parties, spanning over seven years . . . ." *TCG New York, Inc. v. City of White Plains,* 125 F.Supp.2d 81 (S.D.N.Y.2000) ("the requirements imposed on TCG by the City and the Ordinance, when viewed as a whole and in context, have the effect of prohibiting the ability of TCG to provide telecommunications services").

Indeed, with the exception of *City of Auburn,* a case in which preemption was addressed for the first time in the Court of Appeals, Qwest cites only one case in which FTA preemption was decided in a motion for judgment on the pleadings. *Bell Atlantic–Maryland, Inc. v. Prince George's County,* 49 F.Supp.2d 805, 812–13 (D.Md.1999), vacated on other grounds in 212 F.3d 863 (4th Cir.2000). In that case, the government defendant sought relief under Rule 12(c), and the parties stipulated that the matter would be decided under Rule 12(c). The court explained that "[s]ince the parties have agreed that the matter be decided in its entirety on the present motion, Bell Atlantic's opposition to the County's motion will be treated as a counter-motion for judgment on the pleadings." *Id.* at 807. The court explicitly stated that the "parties do not disagree about any material facts involved in this case and the outcome depends upon pure questions of law." *Id.* at 812–13. In this case, there are at this point significant disagreements about important facts, and Berkeley is unwilling to stipulate that the preemption issue may be decided on the pleadings alone.

Moreover, the Ninth Circuit's decision to take the preemption claim up on appeal as a matter of law in *City of Auburn* appears to have been influenced by the absence of any dispute between the parties about issues that are hotly contested in this case. The court noted that "there is no factual dispute about the activity conducted by Qwest, nor the applicability of the ordinance to its activity. Therefore, the controversy is essentially legal in nature." *City of Auburn,* 260 F.3d at 1172. Here, while the Court recognizes that this controversy is essentially legal in nature, Berkeley vigorously disputes relevant facts, including those that relate to whether the Ordinances actually prohibit or have the effect of prohibiting Qwest's ability to provide service. Because the plaintiff is moving for judgment on the pleadings, the Court may not accept the disputed allegations as true.

In sum, the Court cannot make a preemption finding on a motion for judgment on the pleadings under Rule 12(c). This does not, of course, prevent Qwest from raising similar arguments, albeit supported by evidence, in a motion for summary judgment. The Court's denial of the motions for judgment on the

298

pleadings is not intended to constitute a finding that the Ordinances are not, in fact, preempted. That issue may be decided once and for all when brought to the Court with a more complete factual record. For the foregoing reasons, plaintiff's motions for judgment on the pleadings are DENIED. [Docket Nos. 111, 113]

## II. MOTION FOR TEMPORARY STAY OF DISCOVERY

On February 6, 2002, Berkeley served a lengthy request for production of documents upon Qwest seeking evidentiary support for the bulk of the factual contentions made in the complaint. Two days prior to filing the two motions for judgment on the pleadings, Qwest filed a motion for temporary stay of discovery. Qwest argues that it should not be required to respond to the pending request until this Court has ruled on the two motions for judgment on the pleadings. Relying on the same arguments discussed above, Qwest contends that, because the two motions are to be decided purely as a matter of law, none of the materials requested by Berkeley are relevant. Also implicit in Qwest's request is their hope that the Court will grant the 12(c) motions, absolving them of responsibility for responding to the discovery request altogether.

For scheduling reasons, the instant motion was calendared for the same day as the two motions for judgment on the pleadings. Qwest did not provide any responses to the request while the motion was pending. Because this Court's decision on the motion for temporary stay is being issued concurrently with its decision on the Rule 12(c) motions, any ruling by this Court on the proposed temporary stay would have no effect. The motion is therefore DENIED as moot. That said, as set forth more fully above in the discussion of the two Rule 12(c) motions, the Court is not persuaded that the FTA preemption analysis can occur without reference to evidence outside the pleadings. Accordingly, and particularly in light of the fact that the Court is denying the two Rule 12(c) motions, Qwest is now obliged to respond to proper discovery requests. If an extension of discovery deadlines is necessary, the par-

ties may schedule a status hearing to discuss the matter with the Court. Further, should Qwest object to particular aspects of the request as overly burdensome or irrelevant, it is directed to meet and confer with Berkeley regarding its concerns. If the parties are unable to resolve their differences regarding the requested discovery, Qwest may seek a protective order from the Court. [Docket No. 108]

**IT IS SO ORDERED.**