PACIFIC BELL TELEPHONE COMPANY, Plaintiff,

v.

CALIFORNIA DEPARTMENT OF TRANSPORTATION aka Caltrans, et al., Defendants.

And Related Counterclaims

No. C02–02500 JSW.

United States District Court, N.D. California.

March 4, 2005.

Carol M. Anderson, Pacific Telesis Group–Legal, Bobby C. Lawyer, Pacific Telesis Group Legal, Craig E. Stewart, Jones Day, Robert A. Mittelstaedt, Jones Day, William J. Dorgan, Pillsbury Winthrop LLP, Christopher R. Ball, Pillsbury Winthrop LLP, San Francisco, CA, for Pacific Bell Telephone Company, Plaintiff.

Ronald W. Beals, Attorneys for Department of Transportation, Todd Van Santen, Department of Transportation, Sacramento, CA, for California Department of Transportation also known as Caltrans, a division of the California Business, Transportation and Housing Agency, Jeff Morales Director of the Department of Transportation, Thom Niesen Acting Deputy Director of the Department of Transportation, Maintenance and Operations, Will Kempton, Lawrence H. Orcutt, Defendants.

## ORDER RE CROSS–MOTIONS FOR SUMMARY JUDGMENT

WHITE, District Judge.

Now before the Court is the motion for summary judgment filed by plaintiff Pacific Bell Telephone Company ("Pacific") and cross-motion for summary judgment file by the defendant State of California (the "State"). Having carefully reviewed the parties' papers and considered their arguments and the relevant legal authority, and good cause appearing, the Court hereby **DENIES** Pacific's motion for summary judgment and **GRANTS** the State's cross-motion for summary judgment.[1]

## FACTUAL BACKGROUND

In this action, Pacific is challenging the $6.40 per lineal foot of conduit fee that the State charged Pacific for use of the State's right-of-way along a controlled-access highway. To modernize its network and enlarge telecommunications capacity, in the late 1990's Pacific began developing its North Coast Franchise Obligation Project ("North Coast Project") to lay fiber optic cable between Ukiah and Eureka. (Declaration of David W. Edmonds in Support of Pacific's Motion ("Edmonds Decl."), ¶ 5); (Declaration of L. Byron McDaniel in Support of Pacific's Motion ("McDaniel Decl."), ¶ 3). When Pacific began developing its North Coast Project, Pacific was aware that the State did not favor allowing use of its rights-of-way along controlled-access highways, and thus, did not consider using the State's rights-of-ways as an option. (Edmonds Decl., ¶ 10, Ex. B; Declaration of Christopher R. Ball in Support of Pacific's Motion ("Ball Decl."), Ex. A at 78:4–19).

Pacific initially intended to develop the North Coast Project on country roads and easements from private landowners. However, with respect to a twenty-mile stretch, the initially planned route through the Humboldt Redwoods State Park along Highway 254 became more expensive than Pacific was willing to pay. Due to fears about disrupting habitat and concerns that trenching along the roadway would damage the root structure of the redwood trees, using Highway 254 would have entailed delays and an estimated $10 million in mitigation costs. (Edmonds Decl., ¶¶ 7–9).

Generally, in the past, Pacific, along with other private entities, had been prohibited from developing on the State's rights-of-way except in limited circumstances. (Edmonds Decl., ¶ 10 ("I was generally aware that Caltrans did not favor allowing right-of-way use of such 'access-controlled' freeways."); Declaration of Royal B. McCarthy in Support of the State's Motion ("McCarthy Decl."), ¶ 2; Declaration of Peter Schultze in Support of the State's Motion ("Schultze Decl."), ¶ 5). But after other potential routes became too expensive or infeasible due to environmental concerns, and after the State's representative, Royal McCarthy, suggested use of the State's rights-of-way as a possibility, Pacific turned to using the State's rights-of-way along a stretch of twenty-miles of Highway 101 for the North Coast Project. (Edmonds Decl., ¶ 10, Ex. B; Ball Decl., Ex. A at 78:4–19).

---

1. The State objected to the Declaration and expert report by William L. Fitzsimmons pursuant to Federal Rule of Evidence 702 on the grounds that his opinion is based on unreliable principles and methods and unsupported by sufficient facts or data. The State also objected to Exhibit A to the Declaration of Christopher R. Ball in Support of Pacific's Motion ("Ball Decl.") as hearsay. These evidentiary objections are overruled. The Court need not rule on the State's evidentiary objections to Exhibits AA and Z to the Ball Declaration because the Court did not need to consider such evidence in order to resolve the parties' cross-motions for summary judgment.

The State charged Pacific $6.40 per lineal foot of conduit for use of its right-of-way along Highway 101. (McDaniel Decl., ¶ 17). Using the State's right-of-way along Highway 101 was over $19 million cheaper than the other routes Pacific considered for the North Coast Project. (Exhibit 53 to the Deposition of David W. Edmonds, attached to the State's Motion). Nevertheless, once Pacific learned of the opportunity to use the State's right-of-way and the amount the State would charge for such use, Pacific decided to lay two, rather than three, conduits in its North Coast Project. (McDaniel Decl., ¶ 21). At least four other companies have also paid $6.40 per lineal foot of conduit for permits to use the State's controlled access rights-of-way. (Schultze Decl., ¶ 7, Ex. E).

## ANALYSIS

### A. Legal Standard on Summary Judgment.

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir. 2000). A party who moves for summary judgment who does not bear the burden of proof at trial, must produce evidence that would entitle him or her to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden,* 213 F.3d 474, 480 (9th Cir.2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996). It is not the Court's task to "scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir.1995)). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997).

### B. Cross–Motions for Summary Judgment

Pacific moves for summary judgment, arguing that Caltran's compensation requirement of $6.40 per lineal foot of con-

duit, standing alone, violates section 253 of the Telecommunications Act of 1996, 47 U.S.C. § 253 (the "Telecom Act"). The State moves for summary judgment on the same issue, arguing that its compensation requirement does not violate Section 253.[2] Section 253(a) of the Telecom Act states: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). Section 253(c) then provides the following safe harbor to violations of subsection (a): "Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government." 47 U.S.C. § 253(c).

The Telecom Act "prohibits state and local governments from creating 'barriers to entry,' legal requirements that prohibit or have the effect of prohibiting a company from providing telecommunication service." *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1170 (9th Cir.2001). "Section 253(a) preempts regulations that not only prohibit outright the ability of any entity to provide telecommunications services, but also those that 'may ... have the effect of prohibiting the provision of such services.'" *Qwest Corp. v. City of Portland*, 385 F.3d 1236, 1239 (9th Cir.2004) (*quoting* 47 U.S.C. § 253).

■ Pacific bears the burden of showing that Caltran's compensation requirement violates Section 253(a). *Qwest Communications Corp. v. City of Berkeley*, 208 F.R.D. 288, 293 (N.D.Cal.2002). Although the Ninth Circuit recently clarified in *City of Portland* that Pacific is not obligated to make an actual showing that a telecommunications provider is effectively prohibited from providing a telecommunications service, Pacific must still come forward with sufficient evidence demonstrating that the requirement at issue has or may act as a "barrier to entry" into the telecommunications market. *City of Portland*, 385 F.3d at 1241. If, and only if, a court finds that a requirement violates Section 253(a), should the court then consider whether the requirement falls within the safe harbor of subsection (c). *Qwest Communications*, 208 F.R.D. at 293 (*citing City of Auburn*, 260 F.3d at 1177).

To demonstrate the State is violating Section 253(a), Pacific relies solely on the fact that the State is charging an amount that exceeds its actual costs and the fact that, after Pacific became aware of the amount of the State's fee, it reduced the

**2.** The State also moves for summary judgment on the grounds that Section 253 is inapplicable because: (1) its compensation requirement is not a legal requirement covered by the Telecom Act, (2) its compensation requirement is a comprehensive governmental policy and thus not covered by Section 253; and/or (3) prohibiting the State from collecting the fee at issue would then require the State to give a gift of public funds. The State cannot dispute that its requirement to pay $6.40 per lineal foot of conduit is a requirement, and has not provided any authority to support its argument that its requirement is not covered by Section 253. The State's reliance on *Qwest Corp. v. City of Portland*, 385 F.3d 1236, 1242 (9th Cir.2004) for the proposition that comprehensive governmental policies are exempt from Section 253 is misplaced. The Ninth Circuit's statement to that effect in that case was dicta. The Court also rejects the State's third argument, that restricting the fees it could collect would then translate to a forced gift of public funds. The issue here is not whether the State can collect *any* fees, but whether the amount of fees charged here, $6.40 per lineal foot of conduit, violates Section 253. Therefore, the Court DENIES the State's motion on these alternative grounds.

size of its North Coast Project. The Ninth Circuit has not yet ruled on whether fees imposed on telecommunications providers must be cost-based.[3] In reviewing the out-of-circuit authority applying Section 253(a), the Court did not find support for the proposition that charging fees which exceed costs, standing alone, is a *per se* violation of Section 253(a). *See Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1271 (10th Cir.2004) (assumes "not every increase in costs creates a prohibition within the meaning of § 253").

Pacific relies on *City of Auburn*, 260 F.3d at 1176 and *AT & T Communications of the Southwest, Inc. v. City of Dallas*, 8 F.Supp.2d 582, 593 (N.D.Tex.1998), to argue that charging fees in excess of costs constitutes a barrier to entry under Section 253(a).[4] However, as discussed in footnote three, *City of Auburn* does not stand for such a proposition. *City of Portland*, 385 F.3d at 1244 ("*City of Auburn* ... did not address the specific issue of whether a gross revenue-based fee imposed on telecommunications providers must be cost-based."); *see also TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 78 (2nd Cir.2002) (describing Ninth Circuit's statement about "non-cost-based fees" as dicta).

■ *City of Dallas* does not assist Pacific either. First, the *City of Dallas* court did not squarely hold that merely charging non-cost based fees violates Section 253(a). Instead, the court interpreted the language of the safe harbor subsection (c) as imposing substantive limitations on state and local authority, and thus held that the city could not charge fees that were unrelated to the management of and compensation for the provider's use of the city's public rights-of-way. *City of Dallas*, 8 F.Supp.2d at 591, 593. But courts should refrain from applying the safe harbor provisions of subsection (c) unless and until a violation of subsection (a) has been demonstrated. *Qwest Communications*, 208 F.R.D. at 293 (*citing City of Auburn*, 260 F.3d at 1177); *see also BellSouth Telecommunications, Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1187 (11th Cir.2001) (criticizing *City of Dallas* for interpreting subsections (b) and (c) as imposing substantive limitations on state and local authority, as opposed to functioning solely as "safe harbors" or affirmative defenses to preemption of conduct that would otherwise violate subsection (a)).[5] Furthermore, in addition to the fees, the court found the ordinance at issue objectionable

---

3. In *City of Auburn*, in holding the ordinance at issue violated the Section 253(a) based on a combination of factors, including vesting the cities with discretion to grant or deny a franchise, lengthy application requirements, authorizing civil and criminal penalties, and charging fees that were not based on the costs of maintaining the rights-of-way, the court stated: "Some non-tax fees charged under the franchise agreements are not based on the costs of maintaining the right of way, as required by the Telecom Act." *City of Auburn*, 260 F.3d at 1176. However, in *City of Portland*, the Ninth Circuit clarified that *City of Auburn* "did not address the specific issue of whether a gross revenue-based fee imposed upon telecommunications providers must be cost based." *City of Portland*, 385 F.3d at 1244.

4. Pacific also relies on *Bell Atlantic–Maryland, Inc. v. Prince George's County, Maryland*, 49 F.Supp.2d 805, 817 (D.Md.1999). However, Pacific's reliance on *Bell Atlantic–Maryland* is misplaced because this opinion was vacated by the Fourth Circuit, and thus, is not good law. *Bell Atlantic Maryland, Inc. v. Prince George's County, Maryland*, 212 F.3d 863 (4th Cir.2000).

5. The Court notes that the *City of Dallas* court did state that "any fee that is not based on AT & T's use of City rights-of-way violates § 253(a) of the FTA as an economic barrier to entry." Nevertheless, although the *City of Dallas* court made this broad statement, its entire analysis centered on the language of subsection (c) requiring that compensation be for use of rights-of-way, rather than on whether the fees prohibited or may have prohibited the ability of any entity to provide

because it vested the city with discretion to grant or deny a franchise and imposed burdensome application requirements. Therefore, the *City of Dallas* does not support Pacific's proposition that charging non-cost fees, standing alone, violates Section 253(a).[6]

■ The Court thus concludes that Pacific has not met its burden to demonstrate that merely charging fees in excess of the State's costs is *per se* preempted by Section 253(a). However, this does not end the Court's inquiry. While "not every increase in cost creates a prohibition within the meaning of § 253," the Court must examine the record before it to determine whether the compensation costs charged have or may "materially inhibit" the provision of services. *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1271 (10th Cir. 2004); *see also Qwest Corp. v. City of Santa Fe*, 224 F.Supp.2d 1305, 1317 (D.N.M.2002), *aff'd* 380 F.3d 1258 (2004) (Because "Section 235(a) speaks in terms of a prohibition, not in terms of minor delays, ... increased costs, and occasional inconvenience .... some aspects of a local regulation, such as the fees ..., may require careful analysis of the factual record in order to determine whether they have a prohibitory effect.") (internal quotations and citation omitted); *City of Berkeley*, 208 F.R.D. at 293–94 (holding that the court could not determine based on the ordinance language and complaint allegations alone whether the ordinance violated § 253(a), but rather would need to examine *evidence* of the ordinance's effect).

Based on the record before the Court, the Court finds that Pacific did not produce sufficient evidence to demonstrate that the amount of the State's fee is a prohibition within the meaning of Section 253(a), an issue on which Pacific bears the burden of proof at trial.

The analysis by the district court in *City of Santa Fe* is instructive. There, the parties were subject to an earlier franchise agreement under which Qwest paid an annual franchise fee of two percent of its gross receipts from local exchange service. *City of Santa Fe*, 224 F.Supp.2d at 1308. For the 1999–2000 fiscal year, the annual fee was $576,166. *Id.* at 1310. The city then passed the ordinance at issue which provided: (1) the city would charge cost-based registration and application fees; (2) the provider had to provide an appraisal of the "fair market rental value" of the right-of-way issued by a third-party appraiser; (3) the city was given discretion to grant or deny a lease; (4) if the lease was granted, the lessee had to pay an appraisal-based rental fee for use of the city's rights-of-way; (5) the lessee was also required to dedicate all conduit laid upon the city's property to the city; (6) if the lessee installed new conduit, the lessee was required to install double the amount of capacity needed for its own use. *Id.* at 1309. To install one four-by-four foot cabinet on a twelve-by-eighteen foot concrete pad within the city's right of way, Qwest incurred over $10,000 in costs to perform surveys and would have had to pay $6,000 in rent for use of the property. In the

---

telecommunications service. Therefore, to the extent this statement in *City of Dallas* is anything other than dicta, the Court finds this unsupported statement on subsection (a) is not persuasive.

6. At the hearing on these cross-motions for summary judgment, Pacific asserted that the Third Circuit's opinion in *New Jersey Payphone Ass'n v. Town of West New York*, 299

F.3d 235 also supports its position that the State's fees violate § 253(a). However, the *New Jersey Payphone* court did not address whether charging non-cost related fees would be a barrier to entry, and thus violate § 253(a). Rather, the circuit court affirmed the district court's finding that granting an exclusive franchise to a single company reduces competition and constitutes a barrier to entry. *Id.* at 242.

city, Qwest had more than 365 cabinets comparable in size to the one installed, along with thousands of other smaller cabinets, pedestals and manholes. Qwest had approximately 120 planned or ongoing projects to install new facilities involving the city's rights-of-way. Pursuant to the ordinance, the city would require Qwest to enter into similar leases and incur similar costs for all uses of any other rights-of-way in the city. Additionally, Qwest would have incurred between 30 and 59 percent in increased costs to meet the requirement of doubling the conduit it laid. *Id.* at 1309–10.

In addition to the unfettered discretion vested to the city to prohibit any entity from providing telecommunications services, the court concluded that cumulative effect of the rental fees, appraisal, dedication, and excess conduit capacity requirements was prohibitory within the meaning of Section 253(a). *Id.* at 1324. The court determined that under the ordinance, Qwest's *annual* costs for rental fees would be $2,190,000, up from the pre-ordinance annual fees of $576,166. Additionally, Qwest would be subject to additional costs for surveys and would have to incur 30 to 59 percent more costs for installing excess-capacity conduit. Under these circumstances, the court concluded that the "massive increase" in costs would have a pro-

hibitory effect. *Id.* at 1325. The Tenth Circuit affirmed that the estimated quadrupling of Qwest's annual costs, which did not include the costs of surveying and obtaining appraisals, rental costs for Qwest's numerous smaller facilities, or the increased costs from the excess conduit requirements, was sufficient to demonstrate that the ordinance would "materially inhibit" the provision of services under Section 253(a). *City of Santa Fe*, 380 F.3d at 1271.

In contrast here, Pacific does not present evidence demonstrating that the State's compensation requirement has or may have a prohibitory effect. Unlike the company in *City of Santa Fe* which had a long history of using the city's rights-of-way to provide telecommunications services, Pacific cannot complain of increased costs as compared to what it was charged in the past because it was developing along a completely new path. Despite the few examples Pacific presents of using the State's rights-of-way, generally, in the past, Pacific, along with other private entities, had been prohibited from developing on the State's rights-of-way except in limited circumstances. (Edmonds Decl., ¶ 10 ("I was generally aware that Caltrans did not favor allowing right-of-way use of such 'access-controlled' freeways."); McCarthy Decl., ¶ 2; Schultze Decl., ¶ 5).[7] In fact,

---

**7.** Pacific cites to deposition testimony of Royal McCarthy as evidence that purportedly demonstrates that the State had historically permitted utility access to controlled-access freeways. However, a review of the deposition testimony reveals that McCarthy merely testified that where a company laid cable on a right-of-way before the highway was designated as access-controlled, the State allowed the company to replace some damaged cable. (Ball Decl., Ex. J at 59:12–60:15). Pacific also submitted a declaration from David Edmonds stating that he had submitted numerous applications for encroachment permits to access public highways and rights-of-way, but notably, Edmonds did not specify that he

had previously applied for an encroachment permit for the State's rights-of way along a controlled-access highway. Furthermore, Edmonds himself states earlier in the same declaration he was aware that the State did not favor allowing use of its right-of-way along of controlled-access highways. (Edmonds Decl., ¶¶ 10 and 15). In Pacific's opposition to the State's motion, Pacific points to deposition testimony regarding instances of the State issuing permits to companies seeking to lay cable along a controlled-access right of way. (Supplemental Declaration of Christopher R. Ball in Opposition to the State's Motion, Ex. C at 76:8–78:4 and Ex. E at 50:10–17). However, such evidence mere-

when Pacific began developing the North Coast Project, Pacific did not consider using the State's rights-of-ways as an option. Rather, Pacific turned to using the State's rights-of-way for its North Coast Project only after other potential routes became too expensive or infeasible due to environmental concerns, and after the State's representative, Royal McCarthy, suggested use of the State's rights-of-way as a possibility. (Edmonds Decl., ¶ 10, Ex. B; Ball Decl., Ex. A at 78:4–19). The evidence demonstrates that using the State's rights-of-way along Highway 101 was over $19 million cheaper than the other routes Pacific considered for the North Coast Project. (Exhibit 53 to the Deposition of David W. Edmonds, attached to the State's Motion).[8]

Pacific did not present any declarations from experts opining that other smaller companies would be prohibited from providing telecommunications services if they were forced to pay the same compensation fees. In fact, the evidence before the Court demonstrates otherwise. As of November 12, 2004, the date the State filed its opposition to Pacific's motion, at least four other companies have paid the fee of $6.40 per lineal foot of conduit for six permits to use the State's controlled access rights-of-way. (Schultze Decl., ¶ 7, Ex. E).[9] Moreover, in addition to the permit

for use of the State's rights-of-way for the North Coast Project, Pacific has since paid the State's fee of $6.40 per lineal foot into an escrow account subject to resolution of this case for two other permits. (*Id.*) Notably, Pacific has not asserted that the size of other two projects were reduced due to the expense of the State's fees. Thus, at most, Pacific's evidence demonstrates that it reduced the amount of services on one project. Significantly, Pacific failed to present any authority demonstrating that a reduction in services amounts to a prohibition or material inhibition under Section 253(a). Therefore, based on the record before the Court, the Court cannot find that Pacific demonstrated that the State's fees violate Section 253(a). Accordingly, the Court DENIES Pacific's motion for summary judgment and GRANTS the State's cross-motion.

## CONCLUSION

For the foregoing reasons, the Court DENIES Pacific's motion for summary judgment and GRANTS the State's cross-motion.

**IT IS SO ORDERED.**

---

ly confirms that the State had allowed use of such rights-of-ways as exceptions to its policy, which is not disputed. Therefore, the Court finds that Pacific has not submitted evidence creating a question of fact on whether the State had historically permitted use of its rights-of-way along controlled-access highways.

8. Even if the State's fee of $6.40 per lineal foot for two or three conduits for twenty miles along Highway 101 is considered, the difference between using this route and the other routes Pacific contemplated would be still be approximately $18 or $17 million, respectively.

9. The expert report prepared by William L. Fitzsimmons that Pacific submitted merely provided a generalized opinion that charging non-cost based fees may be monopolistic and may have the effect of prohibiting services. (Declaration of William F. Fitzsimmons, Ex. A). Fitzsimmons did not provide any analysis or discussion of the factual situation at issue here. He did not discuss the actual or potential effect the fee being charged by the State is having or may have in California. Therefore, the Fitzsimmons report is not relevant or probative on the issue of whether the State's fee of $6.40 per lineal foot creates a prohibition within the meaning of Section 253(a).